No. 13,879.

Union Exploration Company *v.* Moffat Tunnel
Improvement District et al.
(89 P. [2d] 257)

Decided March 27, 1939.

Mr. Dallas S. Townsend, Mr. Thomas M. Brassel, Mr. Ira C. Rothgerber, Mr. Walter M. Appel, Mr. Ira C. Rothgerber, Jr., Mr. Horace N. Hawkins, Mr. Horace N. Hawkins, Jr., for plaintiff in error.

Mr. Erskine R. Myer, for defendants in error.

*En Banc.*

Mr. Justice Young delivered the opinion of the court.

The Moffat Tunnel Improvement District, a municipal corporation, instituted an action in the district court of Gilpin county against the Union Exploration Company, a Colorado corporation, to quiet title to approximately fifty acres of land at the head of South Boulder canon, which it had occupied and used as a tunnel site and railroad right of way in the construction of a railroad tunnel and water tunnel through the continental divide. The parties will be designated respectively as the district or plaintiff and the company or defendant. As a condition precedent to the quieting of title the district asked the court to determine the value of the land so taken and offered to pay the amount so fixed to the company. The value of the timber taken was stipulated to be $200 and the court found the value of the land taken to be $15,000, which the district forthwith paid into court for the use of the defendant and a decree was entered quieting title in plaintiff as prayed in its complaint. Defendants seek a reversal of the judgment, making six assignments of

error. As we analyze them they raise but two questions: (1) Whether the allowance of only $15,000 as compensation to be paid by plaintiff for the taking of defendant's lands is sufficient under the evidence, defendant contending that it should have been fixed at $286,463 or at the lowest $146,000; (2) whether the court should have allowed anything in addition to their value for the use of said lands between the date of occupation and payment.

The evidence discloses that the land in question had been patented by Mr. Hirsch, principal owner of the defendant company, twenty eight or twenty nine years prior to the trial. Beginning many years prior to 1923 there had been various abortive attempts to construct a tunnel through the mountains to be used by the Denver and Salt Lake Railway, commonly referred to as the Moffat Road, it being soon apparent that the latter could not meet the expense of operation enhanced by steep grades and excessive snow fall in the high mountain passes through which its line passed in traversing the continental divide. After long years of receivership it was evident in 1922 that the abandonment of the Moffat Road could not be much longer postponed unless some less expensive means of crossing the divide was made available. The railroad company had neither the money nor the credit to obtain money to build such a tunnel. The northwestern part of Colorado, tributary to the Moffat Road was particularly rich in coal resources, live stock raising was extensive and it was highly desirable, if not absolutely necessary for the welfare of Denver and the immediately surrounding territory, that steps be taken to preserve the railroad connections with the northwestern part of the state. To this end an act was passed by the legislature in 1922, chapter 2, Extraordinary Session Laws, 1922, sections 200 to 220, chapter 138, '35 C. S. A., creating the Moffat Tunnel Improvement District, and granting it powers, including the power of eminent domain, necessary to construct a tunnel and to make it available for railroad use.

The act provided that the east portal of the tunnel should be near the head of South Boulder canon. From the time of its first consideration there had been a strong probability that if and when a tunnel were built it would be so located. The defendant's land was not the only available site. Two alternate sites, one less desirable because at a higher altitude, and the other at the same altitude as the one built, longer and probably more expensive and containing a slight curve, were shown by the evidence to be available for the construction of a tunnel measurably satisfactory for use by a railroad and for the conveyance of water. That the defendant's land offered the best available site we think clearly appears from the evidence, and the trial court so found.

When the tunnel district entered upon defendant's land it did not proceed to condemn such thereof as it required for its purposes, but entered into a written agreement with defendant under which it was permitted to make such entry, the contract containing, among other provisions, the following: "Fourth: After the bore of the main transportation tunnel has been completed through the lands of the company, the parties hereto will forthwith endeavor to agree upon the amount to be paid to the company by the district, as compensation for all timber and other materials cut and used upon and from the lands of the company, subsequent to the date hereof, and for the occupation, either temporary or permanent, of any portion of the surface thereof, under the right granted by paragraph 'Second' hereof, and for the use of the lands of the company taken or occupied by the district for purposes of the construction and future operation and maintenance of the tunnel, including therein such easements, surface or otherwise, including easements of support, as may be reasonably necessary for such construction and operation; and damages to the remaining lands of the company not so taken or occupied." The contract further provided, that in the event no agreement could be made with respect to compensation, for submission to arbitration

under pertinent provisions of the Code of Civil Procedure. The contract contained also the following provision: "The arbitrators having taken and subscribed an oath before some person authorized by law to administer oaths to the effect that they will well and truly try, and impartially and justly decide, the matter in controversy according to the best of their ability, shall, as soon as possible after their selection, meet to hear and decide the questions so submitted to them, and shall give to each party to the controversy reasonable notice of the times and places of such meetings, at which times and places and after hearing the parties, and taking such testimony or making such investigations as they may deem necessary, they shall decide the matters in controversy, according to the very right of such matters, and shall reduce their decision to writing and serve a copy of such award upon each of the parties, and such award when made and delivered as aforesaid, shall become and be binding and conclusive upon the parties, and each of the parties agrees to be conclusively bound thereby. In event of disagreement between the arbitrators the decision and award of any two of them shall constitute the decision and award above referred to."

The parties were not able to agree on a settlement and each selected an arbitrator, but the two arbitrators were unable to agree upon a third. Some litigation between the parties within and without the state of Colorado followed prior to the institution of the action, the judgment in which is before us for review. In the findings made by the court prior to the entry of the decree, which indicate clearly the basis on which it found the compensation which the decree awarded, the court sets forth explicitly the various factors that it deemed proper for consideration in determining the value of the property for which compensation was to be allowed under the contract. These findings are lengthy but they are so pertinent to the issues involved that we deem it desirable to set out a large part of them in haec verba as follows:

"We believe the amount that the defendant is entitled to recover from the plaintiff in this case is the reasonable value, under all of the facts and circumstances, of the property taken or damaged for the public use. In an eminent domain suit this would be the cash market value, or that value which would be determined from a situation where the defendant was willing and offering to sell but not compelled to do so, and the plaintiff was willing and offering to buy but not compelled to do so.

"The evidence offered by the defendant as to the value of the property rests solely upon the testimony of the witness Prouty, an expert engineer and an authority upon values of property, who qualified as an expert in fixing value for various corporation properties for taxation and numerous other purposes. He fixed the value of this site at $357,000, stating that this was his opinion, considering the benefits to the district from this land considering the use of the tunnel for transcontinental railroads, and for conveying water from the western to the eastern slope. And he also based it upon the difference between the cost of the present tunnel and one located outside of the lands of the defendant. Counsel for the defendant in his argument, however, states that the defendant is entitled to $140,000 and some odd dollars as the value of the property, being the difference in the cost of the construction of the present tunnel and one outside of the lands of the defendant.

"We think from the testimony given by the witness Prouty that outside of considering the value of the lands to the Tunnel District that he based his claim for $357,000 as the value of the tunnel site upon the difference between the cost of the present tunnel and one that might have been located in a different place. This is not a proper measure of values or damages. All of these matters must be taken into consideration by the court in arriving at a value; but they cannot be used as a measure of values. We believe the contention of the defendant is correct, that the court should take into consideration every rea-

sonable use to which this land could be put, and the highest value that could be put upon it for any reasonable use, and that the court should take into consideration that this land was located in a place suitable and desirable for the portal of a great transcontinental railroad tunnel.

"The plaintiff's contention is that the land taken is only worth $10 per acre. The testimony offered was that of the assessor of Gilpin County, who had assessed this land at $10 per acre, and who stated in his opinion that land of that character in that neighborhood was only worth in the market $10 per acre. It is evident that this testimony of the assessor is based upon his experience as an assessor, and upon a value which he placed upon the land for revenue purposes, and this is not the proper measure of the value of property taken for a public use.

"There is testimony that the Tunnel Commission paid $1,000 for a piece of land adjoining the lands of the defendant near the portal, amounting to 40 acres. We do not consider that as of any value in determining the value of the lands of the defendant, for the reason that the McCracken land for which $1,000 was paid was outside of the proper location for a tunnel site; that it could not be said to have had any value as a tunnel site; that only a small portion of it could be used for dump purposes, the balance of it being high up on the mountain side. There are many other reasons why this cannot be used in determining the value of the defendant's lands. One of them perhaps is that the land was bought under circumstances showing that it was not in a free and open market. There is also evidence that on the West Portal land similarly situated to that of the defendant in the East Portal, though not a portal site, was purchased by the Tunnel Commission for the sum of $100 per acre. If we should use this as the measure of value the defendant's land would be worth $5,000. But this land on the West Portal was also bought under the pressure of being taken by eminent domain proceedings, and cannot be said

to have been purchased in an open and free market. Also the land purchased at the West Portal was that for approach of the railroad to the tunnel, and did not constitute a part of the tunnel site or of a portal site for a tunnel, and could have had no value for those purposes.

"A great deal of testimony was offered by the plaintiff concerning the feasibility of another tunnel site about 200 feet north of the present site. It would be a sufficient answer to the plaintiff's contention to say that all of the engineers who were selected by the Tunnel Commission, and who had been selected by the Railroad Company in previous years, and by the City of Denver in previous years, had selected the present tunnel site as the best location for the tunnel, and there is no doubt but that the Moffat Railroad originally was built with the idea of constructing a tunnel at about the place where it is constructed at present. The alternate tunnel site proposed by the plaintiff through its engineers delineated upon several maps introduced in evidence, showed that it would be some 800 feet longer, that it would cost from $150,000 to $350,000 more, and that instead of being a straight tunnel it would have a curve in it. No engineer can be found, nor was found, to testify that a tunnel constructed under such circumstances was as good a tunnel, or as suitable as the one constructed by the present Commission. There is no doubt but that the present tunnel site is the best and the only available site at this point in the Rocky Mountains for the construction of this tunnel, and we leave out of consideration the evidence offered with reference to the alternate tunnel site, except in so far as it may show that it would have cost a good many hundred thousand dollars more to have constructed a tunnel at any other place than the present tunnel site.

"The present situation of the defendant's land is out of the ordinary. In determining the value of its lands, or the value to be paid it, it is difficult to find any precedent or any rule that can be applied. If we were to assume that the land is only valuable for pasture, or for timber

purposes, the amount could be found in a very simple way, but when we have to consider all of the facts and circumstances, and fix the value to this property, for all reasonable purposes, it is difficult under the testimony offered to apply any of the known rules of law in fixing values. We believe these difficulties were known and considered by the parties that entered into this contract, and for that reason that they had provided for a determination by arbitrators who might exercise their common sense and their judgment, and give what seemed to be a fair and reasonable price. There is no testimony in this case directly before the court by which the court can determine the value of this property under the strict rule of its cash market value, but we are of the opinion, considering the needs of the tunnel commission, and of the opportunity of the defendant to sell a piece of land which it had held for a great many years, that a reasonable value of the land taken, and the damages, and the amount to be allowed defendant and paid by the plaintiff would be $15,000. The amount of $200 has been agreed upon as the value of the timber taken, which will be included in the findings of the court.''

■ ■ The court correctly held that the measure of damages to be applied was the same as in condemnation. The parties to the contract, even if we assume they had authority to agree upon a price, did not do so. They left that matter to arbitration but failed in securing either a board of arbitrators under the Code of Civil Procedure or in effecting an arbitration as at common law. The plaintiff could have been compelled to pay no more than compensation, and the defendant could have been compelled to take no less than compensation had plaintiff in the first instance proceeded in condemnation. Where property is taken for a public purpose, compensation is all that is required to work justice to both interested parties. That property has already been taken into physical possession by plaintiff with defendant's consent on an agreement providing for a subsequent deter-

mination of compensation if there should be a controversy "according to the very right of such matters" does not change the measure of compensation. All that was attempted to be done by the contract was to fix the method of its determination. This method the parties have not been able to apply, and each blames the other for the failure. Either or both may be responsible for the failure of the scheme for determining compensation for which provision was made in the contract. In any event both parties are before the court; one has taken the other's property without paying compensation, and comes into court offering to pay what shall be found by the court to be reasonable and just. Defendant prays that "unless parties agree upon arbitrators and value is fixed by them" that the court shall determine the controversy. Under such a situation a court of equity may properly take cognizance of the dispute and determine the amount due under the contract, for the law requires that compensation be paid even in the absence of a contract. Article II, section 15, Colorado Constitution.

Defendant's counsel contend that "the most profitable and advantageous use to which the property is adapted is the basis upon which fair compensation should be determined." We think this proposition is correct. Section 17, chapter 61, '35 C. S. A. Cases to this effect could be cited without number. We call attention to a few mentioned in defendant's brief: *Colorado M. Ry. Co. v. Brown,* 15 Colo. 193, 25 Pac. 87; *Denver etc. R. R. Co. v. Griffith,* 17 Colo. 598, 31 Pac. 171; *Denver Co. v. Howe,* 49 Colo. 256, 112 Pac. 779; *Scurvin Ditch Co. v. Roberts,* 58 Colo. 533, 146 Pac. 233; *Wassenich v. Denver,* 67 Colo. 456, 186 Pac. 533. In the latter case the rule for determining compensation is well stated in the following language: "The jury are to determine and allow the present fair, cash market value at the time of the trial, and are not to allow for any speculative or prospective values. In determining the present cash value the most advantageous use to which the property may reasonably be applied may

be considered. Any reasonable future use to which the land may be adapted or applied by men of ordinary prudence and judgment may be considered in so far only as it may assist the jury in arriving at the present market value. The owner is entitled to have considered the most advantageous use in the future to which the land may be reasonably applied, not with the view of allowing him for speculative or prospective damages or values, but only as such evidence may bear upon or affect or assist in arriving at the present market value. It is the duty of the jury to find and allow no more than the present market value, no matter what the future prospects may be, and this character of evidence may be considered only for the purpose of ascertaining the market value at the time of the trial. After considering any and all reasonable uses to which the property may be put in the future, the question is, taking all things into consideration, what is the present market value, not what will or may be its value later on account of some use to which it may be put in the future. Market value ordinarily means what price property would bring if sold in the open market under ordinary and usual circumstances, for cash, assuming that the owner is willing to sell and the purchaser willing to buy, but neither under any obligation to do so. So the question for the jury to answer was, considering its reasonable availability for all valuable uses, or the most advantageous use, how much would the property bring in cash if offered now for sale by one who desired but was not obliged to sell, and was bought by one who was willing but not obliged to buy.''

We call attention also to *Harrison v. Young,* 9 Ga. 359, and *Young v. Harrison,* 17 Ga. 30. In its opinion in the latter case the court said: ''It is not difficult to see that such prospective value of a piece of ground might be its chief element of value to its owner. An owner of land, peculiarly situated by reason of its proximity to some great city or great work of internal improvement, may look into the future and see that it will, at some distant

day, become extremely valuable by reason of its situation, and that none other can be procured for the purpose for which he anticipates that it will be needed. He desires, accordingly, to keep it, knowing that it will be a fine property for his children, if not for himself. If deprived of that property for public purposes, and especially for the benefit, at the same time, of a private company, can he have 'just compensation' unless reference is had to the prospective value of the land, and unless that is, to some extent at least, taken into the account?''

In *Boom Co. v. Patterson,* 98 U. S. 403, 25 L. Ed. 206; speaking with respect to compensation the court laid down the following rule: ''In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted; that is to say, what is it worth from its availability for valuable uses. Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it, and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated.

''So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future.''

In *Pittsburgh, C. C. & St. L. Ry. Co. v. Gage*, 286 Ill. 213, 121 N. E. 582, the Supreme Court stated the rule as follows: "The owner of land appropriated for a public use is entitled to its value for the most profitable use for which it is available, and a capacity for a future use which may be anticipated with reasonable certainty, though dependent upon circumstances which may possibly never occur is competent to be shown and considered by the jury in fixing the compensation if the capacity for such use in fact enhances the market value of the land sought to be taken in its present condition and state of improvement."

While there can be no question that adaptability to a special and advantageous use, including the use for which the property is being taken, is to be considered, and that evidence of such adaptability is admissible, it is to be considered only in so far as it affects the market value of the land. That the tunnel using defendant's land as a portal would be straight and shorter than would another at the same altitude, and consequently better; that it could be built $146,000 cheaper than another at the same altitude using any alternate site suggested, are facts properly to be shown as evidence affecting the market value of the site. Availability of the site for the portal of a tunnel is not, however, the only factor to be considered. A site might be suitable in every respect for the building of a physically satisfactory tunnel at a less cost than on any available alternate site, and the prospect of any demand for it be so remote that its suitability for tunnel purposes would raise the market value of the land required but little or not at all above that of similar adjacent or nearby land not suitable for such purposes. The cost of the tunnel might be so great, the expenditure required in building a railway line to its two portals so large, as almost if not entirely to destroy any value due to a competitive demand for the site. The evidence before the court disclosed that the cost of the tunnel was slightly under $15,000,000 and the testimony of defend-

ant's experts was to the effect that no railroad other than the Moffat road could have built connections from already existing lines without the expenditure of from $11,000,000 to $39,000,000 in addition to the cost of the tunnel. The Moffat road from the inception of operations had been practically bankrupt. The evidence justifies the conclusion that there was no active or competitive demand for the land for a tunnel site by railroads anywhere. The city of Denver had attempted to issue bonds in the sum of $3,000,000 to partly finance the construction of a tunnel for the transportation of water and for the use of the Moffat Railway, but its action in so doing had been declared unconstitutional. *Lord v. Denver,* 58 Colo. 1, 143 Pac. 284. There was practically no prospect of a tunnel being constructed until the Moffat tunnel district was created by the legislature, providing for the raising of money for its construction by taxation. The act designated the location of the east portal thereof so that it would fall on or in the vicinity of defendant's land. The value of the property so designated and afterwards taken is to be determined, not in the light of the district's necessities after it was created and the site designated, but in view of the probability of its being required for such purpose before action was in effect initiated to acquire it by the creation of the district, and the designation of the portal site. The principle stated and applied by the Supreme Court of the United States in its opinion in *Olson v. U. S.,* 292 U. S. 246, 54 Sup. Ct. 704, 78 L. Ed. 1236, while that case presented a somewhat different state of facts from those here involved, is applicable. By treaty between the United States and Canada the raising of the shore line of the Lake of the Woods, which lies partly in Canada and partly in the United States, was agreed upon. Olson and others whose lands were in part submerged by the raising of the water level sought to show as an element entering into the market value of the land its special adaptability for reservoir purposes. With respect to this contention the court said: "The fact that the

raising of the lake would take or damage shore lands could not affect their market value. There could be no rational basis for any demand that would affect value to the owner for reservoir purposes unless, as a legal and practical possibility, he or some other person or persons —other than the expropriating authority, could have acquired the right to flow the lands necessary for the lawful raising of the lake. * * * As just compensation includes no increment resulting from the taking, petitioners were not entitled to elements of value arising from the prospect that the Government would acquire the flowage easements. Under the circumstances, intention to acquire was the equivalent of the formal designation of the property to be taken. Prices actually paid, and estimates or opinion based, upon the assumption that value to owners includes any such elements are not entitled to weight and should not be taken into account. On the facts shown, it conclusively appears that there was no element of value belonging to petitioners that legitimately could be attributed to use and adaptability of their lands for reservoir purposes. The evidence covered by petitioners' offers was inadmissible. The court rightly excluded reservoir uses from consideration." The international negotiations required, the number of marginal owners, and holders of mortgages on marginal land (in excess of 1225) located in both the United States and Canada, precluded any possibility of a competitive demand for flowage easements for reservoir purposes. Hence the court's conclusion that the suitability of the lands for that purpose could not be a factor that would increase their market value. In the Olson case the difficulty was so great as to preclude either an active or a potential demand. In the instant case the cost was so large as to make the prospect of any active or potential demand remote and uncertain. A theoretical situation somewhat analogous to that present in the Olson case and in the case at bar would be the condemnation of a pond in the Arctic claimed to be of special value for the production

of ice. Its suitability for that special purpose could not possibly be improved upon. The demand for ice and ice ponds to produce it would be nonexistent. The product of the two factors would be nothing in terms of market value. In the temperate zone, near a large city, the pond might be only ten per cent as efficient as an ice producer, but the demand for ice and ponds to produce it so extensive that its market value by reason of its suitability for such use would be greatly increased. The trial court's findings show clearly that he understood this principle of law and had it in mind when he determined the market value of plaintiff's land to be $15,000. The testimony was clear to the effect that, apart from any consideration of the adaptability of the land for tunnel use, its value was from ten to fifteen dollars per acre. The excess allowance over that amount could have been for nothing other than an increased market value due to the suitability of the land for tunnel purposes. The court indicated in its findings that compensation was to be determined as in a condemnation proceeding. It pointed out also that neither the amount by which the district was benefited by the land taken nor the difference between the cost of a tunnel with its portal on plaintiff's land and the higher cost of a tunnel in some other location were proper direct measures of value. In reality the value to the taker and the difference in cost of the site taken and the best alternate site are the same thing expressed in different words. The amount by which the cost of the project to the taker is diminished by using the site taken rather than an alternate site is but the value, or at least an element of the value, of the land to the taker. This, it is said in *Olson v. U. S. supra,* is not the measure of market value. Such difference in cost is proper to be considered, not as the measure in dollars of an element of the market value of the lands in the hands of the defendant, but as a factor that increases their market value in his hands to the extent that a present purchaser, not obligated to buy, would pay more for them by reason of

the difference in cost increasing the prospect of their being required for that purpose. There was no rule, as the court remarked, which could be applied that would determine with exactness in dollars and cents the market value of the defendant's property taken. The findings indicate that the proper elements entering into the determination of market value, as the same were shown by the evidence, were considered, and that those that were not proper were excluded from consideration. Upon such basis the court found that $15,000 was reasonable compensation for the land taken and used. Such finding is a finding of fact, it is supported by the evidence, and under the well-known rule we are not at liberty to disturb it.

 We are of the opinion that the defendant is not entitled to compensation for the use of the property from the time plaintiff entered into possession, to date of judgment. When it was taken plaintiff became entitled to compensation: (1) To be agreed upon if possible as provided in the contract; (2) to be determined by arbitration in so far as the same might be possible within the method provided by the contract; (3) to be determined judicially in accordance with the law. When the parties were unable to agree, and when the scheme provided for arbitration failed to effect its purpose, the courts were open to either party for a determination of the controversy. Neither with good grace may blame the other for the years of delay. Defendant's claim for compensation has at all times been an unliquidated demand. In the absence of contract or of statute so providing—and none is called to our attention—no interest is allowable on an unliquidated claim for damages. *Denver, S. P. & P. R. R. Co. v. Conway,* 8 Colo. 1, 5 Pac. 142; *Denver, S. P. & P. R. R. Co. v. Moynahan,* 8 Colo. 56, 5 Pac. 811; *De Remer v. Parker,* 19 Colo. 242, 34 Pac. 980.

 Cross error is assigned by the plaintiff on the order of the district court assessing as costs fees paid by defendant to its expert witnesses. In an equity case the

taxation of costs ordinarily rests in the sound discretion of the court. Section 6, chapter 43, '35 C. S. A. It appears in the record that the plaintiff agreed that if such fees were to be taxed as costs that the amount thereof is reasonable. In this case defendant, since it did not dispute plaintiff's right to the possession and use of the land, was in effect the plaintiff in so far as the recovery of damages was concerned. Under the peculiar situation existing we cannot say that an abuse of discretion in so taxing costs is clearly shown, and for that reason we are of the opinion that the court's determination in that respect should stand.

Judgment affirmed.

MR. JUSTICE FRANCIS E. BOUCK not participating.