The FOWLER IRREVOCABLE
TRUST 1992–1, Petitioner,

v.

The CITY OF BOULDER, a Colorado
municipal corporation,
Respondent.

No. 99SC304.

Supreme Court of Colorado,
En Banc.

Jan. 29, 2001.

Rehearing Denied Feb. 20, 2001.

Caplan & Earnest, LLC, Alexander Halpern, J. Marcus Painter, Boulder, CO, Attorneys for Petitioner.

Opperman & Associates, P.C., Marlin D. Opperman, William M. Schell, Douglass S. Widlund, Denver, CO, Joseph N. deRaismes, III, Boulder City Attorney, Jerry P. Gordon, Boulder, CO, Attorneys for Respondent.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari in this inverse condemnation action to review the court of appeals' decision in *Fowler Irrevocable Trust 1992–1 v. City of Boulder*, 992 P.2d 1188 (Colo.App.1999). The court of appeals reversed a jury's just compensation award of $123,000 against the City of Boulder (Boulder) for its temporary taking of 3.09 acres of private property and $41,000 for the cost of restoring the property to its pre-taking condition.[1] We uphold the jury award of $41,000 in restoration costs and require a new trial regarding the property's fair rental value during the period of Boulder's temporary taking.

I.

During a twenty-six month period from June 1993 to September 1995, Boulder occupied 3.09 acres of vacant, grass-covered land owned by the Fowler Irrevocable Trust 1992–1 (Trust Property). Without obtaining a construction easement, Boulder used the Trust Property as a staging area for construction of the Phase II Goose Creek Channel Improvement Project (Project). The Project, extending from Foothills Parkway to just west of 30th Street, involved construction of a flood control channel, relocation of sewer lines and other existing utilities, and installation of drainage structures, rock walls, and box culverts to contain the one-hundred-year floodplain. The one-hundred-year floodplain covered the entire Trust Property; the high-hazard area of the floodplain encompassed approximately seventy percent of the Trust Property.[2] Boulder's land use regulations prohibited development within the high-hazard area and severely restricted uses in the rest of the floodplain area of the Trust Property. Once completed, the Project would remove the Trust Property and other properties in the Project area from the one-hundred-year floodplain and, consequently, trigger lifting of the building restrictions Boulder's land use regulations had placed on development in the floodplain.

In pursuing the Project, Boulder hired a number of contractors (Contractors). Under its agreements with the Contractors, Boulder had the responsibility to obtain necessary easements from landowners for construction of the Project. Accordingly, it commenced negotiations with the Trust Property owner (Trust); these negotiations were unsuccessful. Instead of instituting an eminent domain action, Boulder—with actual knowledge of the Contractors' activities—allowed the Contractors to use Trust Property for a con-

---

1. We granted certiorari on two issues: (1) "Whether the court of appeals erred in holding that, in evaluating just compensation for a temporary taking, the probability of a future change in use restrictions is irrelevant if it would occur after the temporary taking has terminated"; and (2) "Whether the court of appeals erred in holding that a tort standard of damages governs the award of restoration costs in evaluating just compensation for a temporary taking."

2. The "one-hundred-year floodplain" is the area of land covered by the waters of a flood that has a one-percent chance of occurring in any single year. *See* 1 Arden H. Rathkopf & Daren A. Rathkopf, 1 *The Law of Zoning and Planning* § 7.02[1], at 7–4 (Edward H. Ziegler, Jr. ed., 2000). A high-hazard area includes that area covered by the one-hundred-year flood, where the product of the floodwater velocity and its coincident depth is four or greater, or where the depth of the floodwater is four feet or greater.

struction staging area.[3] After twenty-six months of occupation, the Contractors left the surface of the Trust Property scarred with wheel tracks and piled with rocks, rubbish, and other waste material.

The Trust brought this inverse condemnation action against Boulder in November of 1994, while one of the Contractors still occupied the Trust Property. The Trust based its claims on Article II, section 15 of the Colorado Constitution and sections 38–1–101 to 122, 10 C.R.S. (2000). Pursuant to section 38–1–101, the trial court bifurcated the issues of liability and damages. In the bench trial, the trial court found Boulder liable for the permanent taking of 347 square feet of Trust Property for a sewer easement (Parcel A)[4] and the temporary taking of 3.09 acres of Trust Property for a construction staging area (Parcel B). The trial court found the temporary taking of Parcel B occurred for a period of twenty-six months between June 1993 and July 1995. The trial court submitted the valuation and compensation issues for determination by a jury of six freeholders.

The trial court ruled that the measure of the just compensation award for Parcel B would be the fair rental value of the Trust Property during the twenty-six month period, plus restoration costs. However, its evidentiary rulings and instructions regarding the fair rental value award allowed the jury, despite Boulder's objections, to consider valuation evidence based solely on the assumption that no floodplain/high-hazard restrictions applied to the Trust Property during the temporary takings period. For purposes of valuation, the Trust's witnesses utilized sales of commercial properties located outside of the one-hundred-year floodplain, calculated an average square-foot market price of those properties, and assumed (1) that Parcel B of the Trust Property was commercially developable during the temporary takings period, and (2) that a fair rental price would afford a ten percent return on the market value of Parcel B for commercial use.[5] In contrast, Boulder's valuation evidence considered rentals of industrial-zoned property located in a floodplain, such as the Trust Property.

In instructing the jury regarding its compensation award, the trial court intermingled the instructions for permanent and temporary takings. Jury instruction number eight stated:

> You are to determine the value of the property actually taken, and, after having determined such value, you are to state that value in your verdict.

> The value you are to determine for the property actually taken is the reasonable market value for the property on April 22, 1997. "Reasonable market value" means the fair, actual, cash market value of the property. With respect to Parcel A (347 square feet), it is the price the property could have been sold for on the open market under the usual and ordinary circumstances, that is, under those circumstances where the owner was willing to sell and the purchaser was willing to buy, but neither was under an obligation to do so. With respect to Parcel B (3.09 acres or 134,600

---

**3.** The construction contracts between Boulder and the Contractors provided that the Contractors would not enter upon private property without first obtaining permission from the landowners. The contracts also stated that the Contractors would be responsible for repairing or replacing any damage, injury or loss to private property as directed by Boulder's project manager. Finally, the contracts stated that Boulder could repair damage done to private property not corrected by the Contractors, and that Boulder may deduct the cost of such repairs from payments due to the Contractors. Boulder enforced none of these provisions in favor of the Trust Property, despite its project supervisor's actual knowledge of the Contractors' activities.

**4.** The issues associated with permanently taking Parcel A are not disputed here. The jury awarded $1,200 for the permanent sewer easement.

**5.** The expert valuation witness for the Trust testified as follows:

Q: And in performing your analysis, what assumptions did you make concerning the effect of the Goose Creek Floodway with regard to the use of the subject property?

A: There was an assumption-currently the flood plain impacts the majority of the property. There was an assumption made that that flood plain would be channelized to minimize the impact of the flood plain on the subject property. And the expense of that channelization would be borne by others other than the property owners themselves.

square feet), reasonable market value is the price the property could have been leased for on the open market under the usual and ordinary circumstances where the owner is willing to lease and the purchaser is willing to lease, but neither was under an obligation to do so. In addition, with respect to Parcel B, you must also determine the cost to return the property to its condition prior to the taking.

In determining the market value of the property actually taken, you are not to take into account any increase or decrease in value caused by the public improvement. However, you may take into account the probability that the property will be rezoned upward and the resulting impact on the present market value.

Jury instruction number nine stated:

In determining the market value of the property actually taken, you should consider the use, conditions and surroundings of the property as of the date(s) of valuation.

In addition, you should consider the most advantageous use or uses to which the property might reasonably and lawfully be put in the future by persons of ordinary prudence and judgment. Such evidence may be considered, however, only insofar as it assists you in determining the reasonable market value of the property as of the date(s) of valuation. It may not be considered for the purposes of allowing any speculative damages or values.

Jury instruction number nine did not clearly specify whether it applied to only Parcel A (permanent taking), Parcel B (temporary taking), or to both parcels.

Based on the evidence presented and the instructions given, the jury awarded just compensation to the Trust as follows: $1,200 for the permanent taking of Parcel A, $123,000 for the temporary taking of Parcel B, and $41,000 to restore Parcel B to its pre-taking condition for a total of $165,200. The trial court also awarded costs and attorney's fees to the Trust.

Boulder appealed the trial court's rulings, the jury compensation awards, and the trial court's attorney's fee award. The Trust cross-appealed the denial of pre-judgment interest and attorney's fees, pursuant to section 38–1–122. In its decision, the court of appeals affirmed the trial court's liability decision, but reversed the compensation and attorney's fee awards and denied the Trust's cross-appeal. *See Fowler,* 992 P.2d at 1201. We review only the compensation award issues involving Parcel B.

While the court of appeals concluded that Boulder temporarily took Parcel B for twenty-six months, *see id.* at 1194, it disagreed with the trial court's admission of expert valuation testimony. The court of appeals ruled that "evidence that Parcel B might be removed from the floodplain sometime in the future is irrelevant for *any* purpose." *See id.* at 1195–96 (emphasis in original). Its reasoning rested on the differences between temporary and permanent takings. As to the restoration award, the court of appeals determined that the difference in a property's value before and after physical damage occurred to it is the standard for awarding just compensation, absent specific factors outlined in the Restatement (Second) of Torts Section 929 (1979). *See id.* at 1197. The court of appeals then remanded the case to the trial court to determine whether any of the factors described in Section 929 of the Restatement (Second) of Torts existed in the case. *See id.* at 1198.

In this appeal, the Trust asserts that the court of appeals improperly prohibited evidence of future changes in land use in temporary takings cases. Clearly, completion of the Project would benefit the Trust Property in the future, but the issue is whether the Trust could have effectuated removal of the Trust property from the one-hundred-year floodplain during the temporary takings period for purposes of determining fair rental value. Boulder argues that the trial court should not have permitted the jury, in awarding fair rental compensation, to consider any evidence of use and value other than those based upon the then-existing floodplain/high-hazard designations applicable to the Trust Property.

In regard to the award of restoration costs for physical damage to Parcel B, the Trust contends that the trial court properly instructed the jury. Boulder counters that the

proper measure of compensation should have been based on the diminution in market value of Parcel B calculated over the temporary taking period.

## II.

We hold that the Trust was entitled to just compensation for the fair rental value of the Trust Property at its highest and best use during the historic period of Boulder's temporary taking. The trial court failed to instruct the jury that changes in land use restrictions could be considered only if they probably could have occurred during the temporary taking period. Because the jury's fair rental value award took into account changes in land use restrictions that probably would occur beyond the temporary taking period, we affirm the court of appeals' judgment setting aside the jury's $123,000 rental value award. In addition, we hold that the trial court properly instructed the jury regarding restoration costs and the evidence supports the jury's restoration award of $41,000.

### A.

#### Temporary Takings Standards

We defer to the trial court's findings of fact and conduct de novo review of its legal conclusions. *See E-470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo.2000). As the name suggests, inverse condemnation is the mirror-image of an eminent domain proceeding; the property owner brings such an action when the taker does not institute an eminent domain proceeding. *Trinity Broad., Inc. v. City of Westminster*, 848 P.2d 916, 921 (Colo.1993). In *Trinity Broadcasting*, we stated that:

> Inverse condemnation is the "taking" of private property for public or private use, without compensation, by a governmental or public entity which has refused to exercise its eminent domain power. Inverse condemnation proceedings are appropriate where the underlying activity warrants condemnation pursuant to the entity's eminent domain power.

*Id.* (citations omitted).

Article II, section 15 of the Colorado Constitution provides that "property shall not be taken or damaged, for public or private use, without just compensation." Inverse condemnation and eminent domain actions both proceed under this provision. *See City of Northglenn v. Grynberg*, 846 P.2d 175, 178 (Colo.1993). When the government takes private property for a public purpose, it must pay just compensation. *See Keller v. Miller*, 63 Colo. 304, 310, 165 P. 774, 777 (1917). Just compensation reflects the value of the landowner's lost interest, not the taker's gain. *See Williams v. City & County of Denver*, 147 Colo. 195, 199, 363 P.2d 171, 173 (1961). "[T]he owner must be put in as good position pecuniarily as if the property had not been taken." *United States v. General Motors Corp.*, 323 U.S. 373, 379, 65 S.Ct. 357, 360, 89 L.Ed. 311, 319 (1945). In an inverse condemnation action, the landowner has the burden of proving the taking and the amount of compensation due. *See Troiano v. Department of Highways*, 170 Colo. 484, 491, 463 P.2d 448, 451 (1969).

Temporary takings require payment of just compensation. *See First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250, 266 (1987). The basic measure of compensation in a temporary taking case is the fair rental value of the property during the period of the taking. *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765, 1773 (1949); 9 Julius L. Sackman, *Nichols on Eminent Domain* § 34.03[3], at 34–60 (rev.3d ed.2000) [hereinafter Sackman].

A temporary taking differs from a permanent taking in two key respects. First, once the period of the taking expires, the landowner's legal interest and occupation of the property is reestablished. Second, the taking is for a definite period of time. Thus, "the landowner has no right under the Just Compensation Clause to insist that a 'temporary' taking be deemed a permanent taking." *First English Evangelical*, 482 U.S. at 317, 107 S.Ct. at 2387, 96 L.Ed.2d 265. The "determination of value of temporary occupancy can be approached only on the supposition that free bargaining between petitioner

and a hypothetical lessee of that temporary interest would have taken place." *Kimball Laundry,* 338 U.S. at 7, 69 S.Ct. at 1438, 93 L.Ed. 1773; *see also Olson v. United States,* 292 U.S. 246, 255–56, 54 S.Ct. 704, 78 L.Ed. 1236, 1244–45 (1934) (holding that the "highest and most profitable use for which the property is adaptable ... in the reasonably near future" determines the market value of the property).

In light of these standards, we now examine the issue of land use restrictions and how they affect the determination of fair rental value in a temporary taking case.

### B.

### *Land Use Restrictions and Fair Rental Value*

Boulder owed just compensation to the Trust for the fair rental value of Parcel B during the twenty-six months it occupied the Trust Property. In determining fair rental value, the trial court and the jury must assume a free bargaining transaction between a hypothetical lessor and lessee. Thus, the Trust was entitled to value the Trust Property at the highest and best use it could have made by lease of the property during the temporary taking period. It could introduce evidence of any probable change in use or building restrictions that did occur or probably could have occurred during the temporary taking period.

Our precedent involving probable changes in zoning restrictions is instructive. We have held that "[u]nder some circumstances, evidence of a probable change in zoning may be admitted where such change is unrelated to the acquisition of the subject property. However, where the change in zoning results from the taking of the subject property ... it is not admissible."[6] *Williams,* 147 Colo. at 201–02, 363 P.2d at 175.

The federal and state constitutions require payment for "the value of the use of the land during th[e] period" of the hypothetical bargained-for leasehold. *First English Evangelical,* 482 U.S. at 319, 107 S.Ct. at 2388, 96 L.Ed.2d at 267. In *Boom Co. v. Patterson,* 98 U.S. 403, 408–09, 25 L.Ed. 206, 208–09 (1878), the Supreme Court held that where owners of private property had the right to modify their land for their own purposes, evidence of the change in value was a pertinent consideration. *See Olson,* 292 U.S. at 259–60, 54 S.Ct. at 710–11, 78 L.Ed.2d at 246–47 (stating that because the owners of private property had the right to modify their land for their own purposes, evidence of a change in value was not prohibited just because the contemplated modification would occur as a result of the taking).

In a permanent taking case, valuation evidence may include a probable *future* change in land use restrictions for purposes of calculating present market value:[7]

> The rule is clear in this jurisdiction that the probability of rezoning may be considered ... *insofar as it would reasonably be reflected in present market value.* However, a totally speculative or conjectural estimate of future use of property would not and should not be reflected in the determination of the property's present value. Accordingly, unless the evidence relating to the likelihood of rezoning rises to the level of a probability, it is inadmissible in a condemnation proceeding.

*Stark v. Poudre Sch. Dist. R–1,* 192 Colo. 396, 398, 560 P.2d 77, 79 (1977) (emphasis in original); *see also Union Exploration Co. v. Moffat Tunnel Improvement Dist.,* 104 Colo. 109, 119, 89 P.2d 257, 263 (1939) (holding that "After considering any and all reasonable uses to which the property may be put in the future, the question is, taking all things into consideration, what is the present market value, not what will or may be its value later

---

6. We equate floodplain land use restrictions to zoning ordinances for the purposes of this opinion, as both limit the landowner's ability to develop the land. *See* Rathkopf, *supra,* § 7.02[3][a], at 7–8 (referring to "flood control zoning ordinances").

7. The probability of a change in use restrictions influences the value of property. *See* The American Institute of Real Estate Appraisers, *The Ap-*

*praisal of Real Estate* 21 (8th ed.1983). Such a probability is referred to as anticipation. *See id.* Anticipation refers to value created by the expectation of future benefits. *See id.* "In the market, the current value of a property is not based on historical prices or cost of creation; it is based on what market participants perceive to be the future benefits of acquisition." *Id.*

on account of some use to which it may be put in the future"); *Boom Co.*, 98 U.S. at 408, 25 L.Ed. 208 (holding that in a takings action, "The inquiry ... must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted"); *United States v. 161 Acres of Land*, 427 F.Supp. 582, 584 (D.Colo.1977) (ruling that evidence of a future zoning change is admissible for calculating just compensation only where it can be shown that "there is a reasonable probability of a change in zoning, and the value added to the land by this probability of change can be taken into account"); 4 Sackman, *supra*, § 12B.14, at 12B–143 to 144 (reciting that, "[T]he zoning ordinances must be such that the use would be permitted in that location, or at least the likelihood of a variance being granted need be shown").

■ In the permanent taking context, the just compensation inquiry asks this question: considering the property's "reasonable availability for all valuable uses, or the most advantageous use, how much would the property bring in cash if offered now for sale by one who desired but was not obligated to sell, and was bought by one who was willing but not obligated to buy." *Union Exploration Co.*, 104 Colo. at 119, 89 P.2d at 263.

■ In the temporary taking context, the just compensation inquiry asks this question: considering the property's highest and best use during the period of the temporary taking, what rental would the property have produced. Proof must simulate a willing lessor/willing lessee transaction, not a simulated sale of the property, and produce a fair rental value for the temporary taking period. *See Kimball Laundry*, 338 U.S. at 7, 69 S.Ct. at 1438, 93 L.Ed. at 1773; *United States v. 1735 N. Lynn St.*, 676 F.Supp. 693, 697, 702 (E.D.Va.1987). The landowner is entitled to recover "an amount equal to the loss which

he has suffered by reason of the taking, and nothing more." *E–470 Pub. Highway Auth.*, 3 P.3d at 23. The award must be just to both the property owner and the public. *See Williams*, 147 Colo. at 199, 363 P.2d at 173–74 (citing *Searl v. School Dist. No. 2*, 133 U.S. 553, 562, 10 S.Ct. 374, 377, 33 L.Ed. 740, 746 (1890)). The landowner is not entitled to a windfall at the taxpayer's expense based on speculative considerations. *See Williams*, 147 Colo. at 199, 363 P.2d at 173.

■ The Trust had the burden of proof.[8] *See Board of Comm'rs v. Noble*, 117 Colo. 77, 79–80, 184 P.2d 142, 143 (1947). A willing lessee in a fair bargaining situation would look at the actual uses that could be made of the property. This would necessarily include considering the then-existing land use restrictions in valuation appraisal testimony. In order to gain increased rental value due to a change in land use restrictions, the landowner must show that the change probably could have occurred during the taking period.

■ The Trust did not show that the floodplain/high-hazard restrictions could probably have been removed during the temporary taking period. The Trust based its valuations entirely on commercial properties that were free of such restrictions. These were speculative values because no evidence showed that a change in the existing restrictions against building for commercial use in the floodplain could have been accomplished between June 1993 and September 1995. The record demonstrates without question that these speculative values directly and materially contributed to the jury's $123,000 rental award. Factoring in the existing land use restrictions, Boulder's appraisals showed a $5,500 fair rental value.

■ Accordingly, the court of appeals correctly required a new trial to determine the fair rental value of Parcel B.[9] Next, we

---

8. Pursuant to section 38–1–114, the right to compensation and its amount were to be determined at the date of trial. The jury should have considered the highest and best use of the Trust Property that could probably have occurred between June of 1993 and September of 1995, and awarded just compensation based on the fair rental value of such use as of the trial date, April 22, 1997.

9. "[E]vidence of the price paid for other properties is admissible only if the properties sold 'are *similar in locality and character* to the property in question and *not so far removed in point of time* to make a comparison unjust or impossible.'" *Herring v. Platte River Power Auth.*, 728 P.2d 709, 712 (Colo.1986) (quoting *Department of Highways v. Schulhoff*, 167 Colo. 72, 80, 445

consider whether the jury's award of restoration costs for physical damage to the property was proper.

## C.

### Restoration Costs Award

■ The parties agree that the Trust is entitled to compensation for physically damaging the surface of the Trust Property occasioned by the Contractors' use thereof, but they disagree on the applicable measure of the award. Boulder asserts that the jury should determine just compensation due to the Trust by the diminution in market value of the Trust Property calculated over the period of the taking. The Trust counters that the jury properly awarded compensation for restoring the Trust Property to its pretaking condition. The court of appeals reasoned that the standard or measure for determining the amount of compensation for physical damage to the property should be the same for an action brought under either tort or inverse condemnation theories. *See Fowler*, 992 P.2d at 1197.

The court of appeals relied heavily on *Board of County Commissioners v. Slovek*, 723 P.2d 1309 (Colo.1986) and the Restatement (Second) of Torts § 929 (1979). In *Slovek*, a trespass action brought in tort, we decided that the compensation required for property damage caused by flooding could be calculated by either the diminution in the property value before and after the flooding or by the cost to restore the property. *See Slovek*, 723 P.2d at 1316. We stated that a trial court must award the compensation necessary to "reimburse the plaintiff for losses actually suffered." *Id.* at 1314. To facilitate appellate review, we stated that the trial court should articulate its reasons for awarding restoration costs as opposed to compensation for diminution in value. *See id.* at 1316.

The court of appeals, as we did in *Slovek*, gave weight to certain factors described in Section 929, comment b of the Restatement (Second) of Torts.[10] It decided that because there was no evidence of the Restatement factors, and the trial court did not clearly articulate its findings with regard to any other factors, awarding restoration costs may not have been proper. *See Fowler*, 992 P.2d at 1198. Consequently, the court of appeals remanded the case to the trial court for consideration of the Restatement factors. *See id.*

■ Based on the record, we uphold the award of restoration costs here. We stated in *Slovek* that the factors that merit awarding restoration costs are not fixed, and that to make them so would forfeit the flexibility trial courts need to achieve fair results. *See Slovek*, 723 P.2d at 1315–16. Although *Slovek* was a tort case, its discussion aids the just compensation inquiry in a temporary taking case involving physical damage to the property.

> If the damage is reparable, and the costs, although greater than original value, are not wholly unreasonable in relation to that value, and if the evidence demonstrates that payment of market value likely will not adequately compensate the property owner for some personal or other special reason, ... selection of the cost of restoration as the proper measure of damages would be within the limits of a trial court's discretion.

*Id.* at 1317; *see also Big Five Mining Co. v. Left Hand Ditch Co.*, 73 Colo. 545, 549, 216 P. 719, 721 (1923) (stating that the cost of restoration may be proper where the "injury is susceptible of remedy at moderate ex-

---

P.2d 402, 406 (1968)) (emphasis added). We will not disturb the decisions of the trial court, absent abuse of discretion, admitting evidence of comparable properties during the valuation portion of the trial. *See id.* This same standard applies to fair rental value evidence in the temporary taking context on remand of this case.

**10.** Comment b to Section 929 of the Restatement (Second) of Torts (1979) states that

> the reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery.... If, however, the cost of replacing the land ... is disproportionate to the diminution in value of the land caused by the trespass, unless there is a reason personal to the owner for restoring the property, ... damages are measured only by the difference between the value of the land before and after the harm.

pense, and the cost of restoring it may be shown with reasonable certainty").

■ "The Fifth Amendment Takings Clause is in a class by itself because, unlike other constitutional deprivations, it provides both the cause of action ... and the remedy." Jan G. Laitos, *Law of Property Rights Protection: Limitation on Governmental Powers* § 17.02, at 17–3 (1999). Pursuant to Article II, section 15 of the Colorado Constitution, the property owner is entitled to just compensation in an inverse condemnation action. The role of just compensation is to put the landowner in the same pecuniary position as though the taking had not occurred. *See United States v. Miller,* 317 U.S. 369, 373, 63 S.Ct. 276, 279–80, 87 L.Ed. 336, 342 (1943).

■ Temporary takings jurisprudence recognizes that just compensation can encompass the cost of restoring the property to its pre-taking condition, as well as the fair rental value of the property over the period of the taking. *See* 4 Sackman, *supra,* § 12E.01, at 12E–7; *see also General Motors Corp.,* 323 U.S. at 383–84, 65 S.Ct. at 362, 89 L.Ed. at 321 (allowing costs for damage to fixtures and equipment destroyed or depreciated during a temporary taking); *Sacramento & San Joaquin Drainage Dist. v. Goehring,* 13 Cal.App.3d 58, 66, 91 Cal.Rptr. 375, 380 (1970) (stating that just compensation in temporary takings matters includes restoration damages); *Paddock v. Durham,* 110 N.H. 106, 108, 261 A.2d 438, 441 (1970) (allowing costs to restore property to its pre-taking condition).

The Trust presented the jury with evidence of physical detriment Boulder caused to the Trust Property and the costs of removing construction debris, recontouring the surface, and reseeding the extensively disturbed area. The record demonstrates that the damage done to the Trust Property was susceptible to repair at a reasonably certain cost based on bids placed into evidence. The property owner was entitled to be made whole. In a freely negotiated lease, the situation most comparable to a temporary taking, parties typically include a provision for damages beyond ordinary wear and tear.[11]

■ Our review of this issue is not hindered by the lack of trial court findings. The record supports the trial court's jury instruction and the award of restoration costs. Boulder made no showing that this award would result in duplication of compensation or that the physical damage benefited the property owner. We will not set aside jury awards if they are based on the evidence and the instructions have not misled the jury. *See Bohrer v. DeHart,* 961 P.2d 472, 477 (Colo.1998) (stating that "We defer to jury verdicts when jurors have been properly instructed and the record contains evidence to support the jury's findings").

Boulder asserts that the Trust's damages are the natural, necessary, and reasonable result of the taking, as measured by the reduction in market value of the remainder of the property. Although diminution in value may be the proper measure of damages awarded for property remaining with the landowner during a temporary taking, it may not adequately measure just compensation for damage to property actually taken temporarily. The term "remainder" refers to the property affected by the taking though not itself taken. *See La Plata Elec. Ass'n v. Cummins,* 728 P.2d 696, 697 (Colo.1986) (holding that diminution in property value is the proper measure of just compensation for remainder property, where such property is located adjacent to property actually taken for a power line easement).

Boulder misplaces reliance on *La Plata.* There, the electric association condemned only a portion of the property for an electrical power line easement. *See id.* The landowners brought an action for reduction in value of the remainder of the property—that portion retained by them—resulting from aesthetic damage and loss of view on a permanent basis. The property owner's loss in *La Plata* inhered in the remainder property

---

11. *See, e.g.,* § 38–12–103, 10 C.R.S. (2000) (providing that a landlord may retain the security deposit to cover "repair work").

and not the property subjected to the taking.[12]

Here, the Trust obtained compensation for physical detriment to property actually taken, the rights to which were restored to it.[13] Although the Trust may have intended to place the Trust Property to a commercial use in the future, it was not required to do so and could have elected to leave the property in its natural, grassed condition for some time.[14] Under Boulder's theory, the land would remain in the disturbed condition Boulder caused, unless the landowner paid the restoration costs. Under the circumstances, the trial court properly instructed the jury that it could award restoration costs as part of the just compensation owed to the Trust .[15]

## III.

Accordingly, we affirm the judgment of the court of appeals returning this case to the trial court for jury determination of the Trust Property's fair rental value during Boulder's twenty-six months of occupation, and we reverse the judgment of the court of appeals in setting aside the jury award of $41,000 to the Trust in restoration compensation. We remand this case to the court of appeals with instructions to return it to the trial court for further proceedings consistent with this opinion.

---

12. By our holding here, we do not mean to say that damages sustained to remainder property can never be compensable in a temporary takings situation.

13. We are not faced here with the situation where the taker actually increased the value of the temporarily taken property, and restoration costs might not be appropriate. *See, e.g., Flood v. United States*, 274 F.2d 483, 487 (9th Cir.1960) (holding that when the government makes an investment in property during a temporary taking, which actually increases its value, the owner is not entitled to have the taker restore the property to its pre-taking condition, because to do so would put the owner in a better pecuniary position).

14. Where the evidence shows that the landowner clearly intends to immediately develop the land, restoration compensation may not be appropriate, as the award could amount to a windfall. Like other case-specific circumstances, the trial court would determine the proper jury instruction based on the proof. Here, although the Trust presented evidence that it submitted a development plan to Boulder, that evidence went to the probability of a future change. in land-use restrictions. There was no showing that development would have commenced immediately.

15. The jury instruction stated, "In addition, with respect to Parcel B, you must also determine the cost to return the property to its condition prior to the taking."