## A97A2057. HULSEY et al. v. DEPARTMENT OF TRANSPORTATION et al.
### (498 SE2d 122)

RUFFIN, Judge.

C. C. Hulsey, Jr. and other property owners sued the Department of Transportation ("DOT"), one of the DOT's contractors and a timber harvesting company for inverse condemnation and negligence arising out of the siltation of a lake. Upon motion made by the DOT at trial, the trial court dismissed two of the property owners, J. B. Jones and Ann Jones, on the ground that there was no evidence they owned any part of the allegedly damaged lake property. The trial court also granted the DOT's motion for directed verdict against the remaining plaintiffs, Hulsey and Reginald Jones, finding that they failed to establish a date of the alleged taking by the DOT. Finally, the trial court granted a directed verdict in favor of the timber company, Inland Container Corporation ("Inland"), on appellants' claim for negligence. All four plaintiffs join in this appeal asserting these decisions as error. For reasons which follow, we affirm in part and reverse in part.

A directed verdict is appropriate where " 'there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict.' OCGA § 9-11-50 (a). . . . A grant of directed verdict can be upheld only where we determine that *all* the evidence demands that verdict. This requires a de novo review." *Carden v. Burckhalter*, 214 Ga. App. 487, 488 (1) (b) (448 SE2d 251) (1994).

The evidence at trial reveals that in October 1990, the DOT contracted with Wright Brothers Construction Company ("Wright Brothers") to build a 2.3 mile portion of a four-lane highway. It appears as though Wright Brothers commenced construction sometime in early 1991. At this time, Wright Brothers cleared and graded a strip along the right of way approximately 200 feet wide through very hilly terrain encompassing pine or hardwood forest, with groundcover consisting of sand, silty loam with leaves and brush. The grading work required Wright Brothers to excavate approximately three million cubic yards of earth. Most of the valleys along the highway path contained streams, and many of these valleys were filled to properly grade the property for the highway. Several of these streams flow into a nearby ten-acre lake, of which Hulsey owns approximately five or six acres. Appellant Reginald W. Jones, Sr. also owns a portion of the lake, and appellants J. B. and Ann Jones own a parcel of property adjacent to the lake.

According to Hulsey, prior to 1991 the lake was usually clear, sometimes cloudy and never muddy. Hulsey testified that after the road construction began, however, "[e]very time it rained the . . .

lake got muddy." Hulsey further testified that when he investigated the situation, he saw that where the highway project was graded, trees and earth were plowed into the stream bed. He stated that rainwater washed the graded dirt into the stream bed and that the sediment ultimately ended up in his lake. Robert Wright, Wright Brothers' vice-president, acknowledged that despite erosion control devices, approximately one percent of the sediment ended up in the lake.

In July 1992, appellants employed engineer James Roberts to further evaluate the cause of the lake siltation. At that time, Roberts walked the entire area following every tributary to discover the origin of the silt. According to Roberts, he "always came up onto the highway that was being built, and the creeks — the draws with the creeks from the highway construction all were very much full of silt."

The project was substantially completed in 1995, at which time the DOT installed concrete flumes to prevent soil from washing out of drainage areas. In October 1995, Roberts performed tests on the lake bed and determined that there was 32,500 cubic yards of silt in the lake. After attributing some of the silt to other causes, Roberts concluded that approximately 20,000 cubic yards of silt resulted from the highway construction.

An appraiser testified concerning the value of Hulsey's house, surrounding property and his portion of the lake as of January 24, 1991 and the value of the same property on October 1, 1995. Based on these two appraisals, the appraiser concluded that the lake siltation resulted in a 45 to 50 percent depreciation in the fair market value of Hulsey's property. The appraiser provided similar testimony concerning the relative values and depreciation in market value of the property owned by Reginald Jones, Sr.

1. J. B. and Ann Jones assert that the trial court erred in dismissing them from the action because there was sufficient evidence showing their property suffered consequential damages as a result of the DOT's siltation of the lake. They argue in their appellate brief that their "damages are capable of being calculated by determining the depreciation of the fair market value of their property." We find no merit in this contention.

" 'Consequential damages to a contiguous tract of land having a different ownership from that in which the taking occurs may be real and may in fact exist, but a separate owner's claim for consequential damages to his land contiguous to the tract where the taking occurs cannot be asserted in a condemnation action. Consequential damages to "the remainder of the tract in which the taking occurs" are the only consequential damages that may be recovered in the condemnation action.' [Cits.]" *Exxon Corp. v. Dept. of Transp.*, 202 Ga. App. 43, 44 (2) (413 SE2d 238) (1991). Compare *Lee v. City of Atlanta*,

219 Ga. App. 264, 266 (3) (464 SE2d 879) (1995) (compensatory damages for taking of easement on condemned property are authorized).

Here, the evidence is clear that J. B. and Ann Jones do not own any of the lake but merely own a parcel of property adjacent to the lake. It is also clear that their inverse condemnation action against the DOT rested upon alleged consequential damages to their own property resulting from siltation of the contiguous lake. Even if the value of the Jones' property depreciated as a consequence of the siltation, the authority is clear that such damages cannot be asserted in a condemnation action. See *Exxon Corp.*, supra. Accordingly, the trial court did not err in dismissing J. B. and Ann Jones from the action on this ground.

2. Appellants assert that the trial court erred in granting a directed verdict against them and in favor of the DOT. The DOT based its motion on the ground that appellants failed to present any evidence proving the date of the alleged taking. Because we find that there was some evidence establishing the date of the alleged taking and the value on that date, we reverse the trial court's grant of a directed verdict in favor of the DOT.

When private property is taken for public use, the owner is entitled to the value of the property as of the date of taking. See *Wright v. MARTA*, 248 Ga. 372, 373 (283 SE2d 466) (1981). Consequential damage to property is also a "taking" entitling the owner to compensation. See id.; see also *Richmond County v. Williams*, 109 Ga. App. 670 (a), (b) (137 SE2d 343) (1964). The date of taking, which is the effective date for determining the amount of just and adequate compensation, must be established because losses occurring before this date are not compensable. *Habersham Downs Homeowners' Assn. v. Dept. of Transp.*, 212 Ga. App. 686 (4) (442 SE2d 868) (1994); *Acree Oil Co. v. Dept. of Transp.*, 216 Ga. App. 586, 588 (1) (455 SE2d 590) (1995), rev'd on other grounds, 266 Ga. 336 (467 SE2d 319) (1996).

There are direct, formal condemnation cases which hold that the "date of taking" is the date on which compensation is tendered or paid to the landowner. See *DeKalb County v. Daniels*, 174 Ga. App. 319 (2) (329 SE2d 620) (1985) and cases cited therein. These cases, however, are inapplicable to situations in which property is taken or damaged by the State for public road or street purposes. In such situations, our Constitution does not command, as a prerequisite for the taking, that just and adequate compensation be "first paid," but rather allows the landowner to be compensated after the taking. See Ga. Const. of 1983, Art. I, Sec. III, Par. I (b). Compare id. at Par. I (a). Moreover, defining the "date of taking" as the date in which compensation is paid is illogical in inverse condemnation cases such as this, where the public entity disputes the mere existence of the taking. Under these circumstances, it is unlikely that any compensation will

be voluntarily paid by the public entity.

We are unaware of any Georgia authority establishing a means for determining the "date of taking" in inverse condemnation cases. We believe, however, that where there is continuous governmental activity that damages private property, it makes sense to utilize a "'date of stabilization'" of the impact as the date of taking, as has been done by courts in other jurisdictions. See 5 Nichols on Eminent Domain, pp. 110-111, § 18.16 (1997); see also *United States v. Dickinson*, 331 U. S. 745, 747-749 (67 SC 1382, 91 LE 1789) (1947); *Smart v. City of Los Angeles*, 169 Cal. Rptr. 174, 176 (1981). "This method measures the date of the governmental 'taking' as of the point in time when the damaging activity has reached a level which substantially interferes with the owner's use and enjoyment of his property. [Cit.]" Id. at 176. Prior to the time of stabilization, landowners may be uncertain whether the governmental invasion was of such a degree that they should seek compensation. Furthermore, fixing the date of taking at an earlier time may lead to piecemeal assessments of the damages because the landowner will not know when the causative factors of the damage will stabilize. After the damage has stabilized, however, the landowner will be well-situated to evaluate the full extent of the damage to his or her property and the amount of compensation necessary to redress the damage. See *Dickinson*, supra.

Under the foregoing rule, we find that there was evidence in this case showing a date of taking. That evidence revealed that in the latter part of 1995 most of the construction was complete and the DOT installed concrete flumes to prevent soil from washing out of drainage areas. Evidence further showed that at that time the landowners assessed the damage to the lake and the diminution in their property values. Thus, because there was some evidence showing a date of taking and the valuation of damages on that date, the trial court erred in granting a directed verdict in favor of the DOT. See *Carden*, supra.

3. Finally, appellants assert that the trial court erred in granting a directed verdict to Inland on their claim that the company's negligent harvesting activity caused silt to flow into the lake. We disagree.

The evidence relating to alleged siltation caused by Inland's conduct showed that in 1993 the company clear cut and harvested 155 acres of timber in the drainage basin leading to the lake. As part of the harvesting project, Inland regraded existing roads and constructed less than a quarter mile of new secondary roads. Inland's district supervisor testified that erosion control devices in the harvested area included some silt fences along the roads, which were placed there by Wright Brothers, and turnouts with holding areas to stop and collect the sediment before it ran down the hill toward the stream. Roberts, the appellants' engineer, testified that when he first

visited the harvested area in March 1996, he did not see any erosion control devices, and based on this observation and the condition of the roads, he concluded that silt must have flowed into the streams.

The foregoing does not constitute any evidence of Inland's negligence. Rather, it merely shows that Inland utilized erosion control devices during its harvesting, and that these same devices were gone when Roberts visited the site approximately two and one-half years later. Appellants have cited no evidence showing silt from the property flowed into the stream, but merely speculate that this must have occurred. It is well established that " '[a]n inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility.' [Cit.]" *Derry v. Clements*, 197 Ga. App. 173, 174 (397 SE2d 594) (1990). Accordingly, because there was no evidence supporting appellants' claim, the trial court properly granted a directed verdict to Inland. See *Carden*, supra.

*Judgment affirmed in part and reversed in part. Birdsong, P. J., and Eldridge, J., concur.*

DECIDED FEBRUARY 25, 1998 

*Gammon & Anderson, Joseph N. Anderson*, for appellants.

*Thurbert E. Baker, Attorney General, George P. Shingler, Deputy Attorney General, C. Latain Kell, Senior Assistant Attorney General; Daniel B. Simon III*, for appellees.