**Robert D. SCOTT, Jr., Plaintiff–Appellant,**

v.

**COUNTY OF CUSTER, Colorado, and the Board of County Commissioners for the County of Custer, Colorado, Defendants–Appellees.**

**No. 06CA1438.**

Colorado Court of Appeals, Div. V.

Nov. 15, 2007.

§ 24–51–1105, C.R.S.2007.

Law Office of Ronald Frindt, LLC, Ronald Frindt, Colorado Springs, Colorado, for Plaintiff–Appellant.

Naylor & Geisel, P.C., John R. Naylor, Pueblo, Colorado; Vaughan & Demuro, Gordon L. Vaughan, Jessica Kyle Muzzio, Colorado Springs, Colorado, for Defendants–Appellees.

Opinion by Judge LOEB.

In this inverse condemnation action, plaintiff, Robert D. Scott, Jr., appeals the judgment and orders entered in favor of defendants, Custer County and the Board of County Commissioners of Custer County (together the County). We affirm in part, reverse in part, and remand with directions.

## I. Background

Scott owns about fifty acres of land in Custer County. He has built a home and other improvements on this land and uses the property as a part-time residence. The southern boundary of the property abuts Custer County Road 255.

In December 2001, the County began a road improvement project on a portion of

County Road 255 that runs along Scott's property. The purpose of the project was to widen and straighten the road for safety reasons. A portion of the road work was done along Scott's side of the road. The County removed trees from that side of the road, but no more than what was required to complete the job.

County Road 255 had a right-of-way width of sixty feet, and many of the trees were removed from the right-of-way. However, despite routine measurements, the County removed some trees beyond the right-of-way that were on Scott's property. In all, the County removed fifty-eight trees belonging to Scott on a .156–acre strip of his property. The County asserts, and Scott does not contest, that the County did not know that some of the trees it removed were actually on private property.

As pertinent here, in December 2002, Scott filed a complaint against the County for inverse condemnation. Supported by a restoration bid from a private contractor, Scott claimed he was entitled to approximately $362,000 in compensation from the County to restore his property to its previous condition, including the planting of new trees. Scott also requested a jury trial on the amount of compensation to be awarded, pursuant to section 38–1–106, C.R.S.2007.

In response, the County filed a pretrial motion in limine requesting the trial court to determine that the standard of compensation should be diminution in value and to exclude any evidence of restoration costs. After briefing and a hearing, the trial court granted the County's motion, but allowed the parties to submit appraisals of Scott's property.

After receiving the appraisals, and upon Scott's motion for reconsideration, the trial court entered an order denying the motion, in which it reaffirmed its ruling that the appropriate measure of compensation was diminution in value. The court found that the proposed restoration costs were unreasonable and that Scott's purported personal reasons for restoration did not justify the restoration cost standard of compensation. The diminution in value was estimated to be $277.

In April and May 2006, the trial court held a bench trial, in which it heard evidence on the issue of whether a taking had occurred. At the conclusion of Scott's case, the County moved to dismiss, arguing that Scott had not proved a taking. The court orally granted the County's motion, finding that Scott had not alleged or proved that the County intended to take Scott's property, and that the taking of Scott's property was not the natural consequence of the County's authorized actions. The court then concluded that Scott failed to prove a taking had occurred.

On June 6, 2006, the trial court entered its written findings of fact, conclusions of law, and order dismissing Scott's inverse condemnation claim with prejudice.

Scott appeals the court's judgment concluding that no taking occurred. He also appeals the court's orders that the proper measure of compensation is diminution in value.

## II. Taking

Scott contends the trial court erred by rejecting his claim for inverse condemnation. Specifically, he contends that, as a matter of law, the trial court incorrectly required him to prove that the County knew or should have known that some of the trees it removed were on his property. We agree.

### A. Legal Analysis

■■■ The determination of whether a taking has occurred is a question of law that we review de novo. *Bd. of County Comm'rs v. Roberts,* 159 P.3d 800, 805 (Colo.App.2006). When reviewing a court's decision in condemnation proceedings, we defer to the trial court's findings of fact and conduct a de novo review of its legal conclusions. *Id.* Where the facts material to the issues on appeal are undisputed, the question is solely one of law. *Gavrilis v. Gavrilis,* 116 P.3d 1272, 1273 (Colo.App.2005). We review de novo the trial court's application of the governing legal standards. *See Matoush v. Lovingood,* 159 P.3d 741, 743 (Colo.App.2006)(cert. granted May 21, 2007)

Both the Fifth Amendment and Colo. Const. art. II, § 15 prohibit the taking of

private property for public use without just compensation. *Thompson v. City & County of Denver,* 958 P.2d 525, 527 (Colo.App.1998).

■ To establish a claim for inverse condemnation under the Colorado Constitution, a property owner must show that (1) there has been a taking or damaging of a property interest; (2) for a public purpose; (3) without just compensation; (4) by a governmental or public entity that has the power of eminent domain, but which has refused to exercise that power. *Id.*

■ Generally, a taking of property occurs when the entity clothed with the power of eminent domain substantially deprives a property owner of the use and enjoyment of that property. *Fowler Irrevocable Trust 1992–1 v. City of Boulder,* 992 P.2d 1188, 1193 (Colo.App.1999) (*Fowler I*), aff'd in part and rev'd in part, 17 P.3d 797 (Colo.2001) (*Fowler II*). However, a taking cannot result from simple negligence by a governmental entity. *Id.* "For a governmental action to result in a taking, the consequence of the action which is alleged to be a taking must be at least a direct, natural or probable result of that action." *Trinity Broad. of Denver, Inc. v. City of Westminster,* 848 P.2d 916, 921 (Colo.1993)(citing *Barnes v. United States,* 210 Ct.Cl. 467, 538 F.2d 865, 871 (1976)); *Fowler I,* 992 P.2d at 1193 (quoting *Trinity,* 848 P.2d at 921).

■ "Therefore, the taking must be a reasonably foreseeable consequence of an authorized action. In other words, the government must have the intent to take the property or to do an act which has the natural consequence of taking the property." *Trinity,* 848 P.2d at 921–22.

Scott does not contend the County subjectively intended to take his property. Rather, he contends, and the County admits, that the County intended to remove a number of trees without knowing that Scott owned some of the trees. Scott further contends that proof of the County's intent to remove trees is sufficient to state a claim for inverse condemnation under the second prong of the *Trinity* test, which requires a showing that the government intended to "do an act which

has the natural consequence of taking the property." *See id.*

The County argues that *Trinity* requires more. Under the County's interpretation of the *Trinity* test, the intent of the governmental entity that a property owner must prove to establish a claim for inverse condemnation extends to the ownership of the property on which the entity performed an authorized act. Thus, the County contends that, for Scott to establish a claim for inverse condemnation, he must prove that the County knew or should have known the trees it removed were on private property belonging to Scott. The trial court agreed with the County's interpretation of the applicable law.

■ The initial issue before us then is whether a property owner may satisfy the second prong of the *Trinity* test without proving that a governmental entity subjectively intended a taking to result from its authorized actions. By looking to the language of the *Trinity* test, the case law that supported the supreme court's adoption of the *Trinity* test, and subsequent cases interpreting that case law, we are persuaded and conclude that a property owner may prevail on an inverse condemnation claim under the second prong of the *Trinity* test in the absence of proof that the governmental entity subjectively intended to effect a taking.

The language of the *Trinity* test suggests two alternative methods for proving a taking through inverse condemnation. This language creates a simple disjunctive test that requires a plaintiff to prove either (1) an intent on the part of the defendant to take the plaintiff's property; or (2) an intent on the part of the defendant to do an act which has the natural consequence of taking the property. *See Trinity,* 848 P.2d at 921–22; *Fowler I,* 992 P.2d at 1193 (emphasizing second prong as distinct from first prong). The first prong focuses on the subjective intent of the defendant, while the second prong focuses on objective causation. Because it is presented in the disjunctive, the *Trinity* test provides a property owner two separate grounds for establishing a taking.

■ The County's interpretation of the *Trinity* test would render the language of

the second prong meaningless. By requiring proof of the government's specific intent to take private property in all inverse condemnation cases, the County would not only make the second prong redundant of the first, but would also practically eviscerate the inverse condemnation action. Contrary to the County's interpretation, under the language of the *Trinity* test, "a plaintiff can establish a takings claim by proving causation without *also* proving intent." *Hansen v. United States*, 65 Fed.Cl. 76, 117 (2005); *see Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355–57 (Fed.Cir.2003); *Baird v. United States*, 5 Cl.Ct. 324, 328 (1984) ("plaintiffs need not prove that the government intended to take their property"); *Barnes*, 538 F.2d at 871 ("plaintiffs need not allege or prove that defendant specifically intended to take property").

The case law cited by the supreme court in *Trinity* supports our conclusion. In *Trinity*, the court articulated the two-prong test to further explain that "[f]or a governmental action to result in a taking, the consequence of the action which is alleged to be a taking must be at least a direct, natural or probable result of that action." *Trinity*, 848 P.2d at 921. The court supported this rule by citing *Barnes*, 538 F.2d at 871. In *Barnes*, the Court of Claims expressly stated that in takings cases, "plaintiffs need not allege or prove that [the] defendant specifically intended to take property," *id.*, before it laid out the language relied upon by the *Trinity* court, which stated that "[t]here need be only a governmental act, the natural and probable consequences of which effect ... a compensable taking." *Id.*

In support of the rule that a "taking must be at least a direct, natural or probable result of that action," *Trinity* also cited *Hartwig v. United States*, 202 Ct.Cl. 801, 485 F.2d 615, 619–20 (1973). *Trinity*, 848 P.2d at 921. In *Hartwig*, the Court of Claims did not require proof of specific intent on the part of the government to establish a taking. Rather, it simply stated that the government is liable for damages "directly attributable to governmental action." *Hartwig*, 485 F.2d at 619.

Other cases cited by the *Trinity* court in support of the two-prong test also support the conclusion that proof of specific intent is not necessary to establish a taking. *See, e.g., Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978) (both a constitutional taking and the intent by defendant to take private property may be implied from actual invasion of property rights); *J.J. Henry Co. v. United States*, 188 Ct.Cl. 39, 411 F.2d 1246, 1249 (1969) ("there must be an intent to take or such definite invasion of private property as to imply it").

Finally, any ambiguity arising from the cases relied upon by the supreme court in *Trinity* is resolved by looking to a seminal takings decision by the United States Supreme Court. The causation analysis of the *Trinity* test's second prong is rooted in *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922). *See Hansen*, 65 Fed.Cl. at 105; Jed Michael Silversmith, *Takings, Torts, & Turmoil: Reviewing the Authority Requirement of the Just Compensation Clause*, 19 UCLA J. Envtl. L. & Pol'y 359, 379–83 (2001–2002). The United States Supreme Court held in *Portsmouth* that the government imposed a servitude upon the plaintiff's property by mounting and firing navy coastal guns that could only be fired over the plaintiff's island. *Portsmouth*, 260 U.S. at 329–30, 43 S.Ct. 135. In holding for the property owner, the Court focused on authorization and causation, but not specific intent. It found "little natural unwillingness to find lack of authority [to mount and fire the guns] even if the possible legal consequences were unforeseen." *Id.* at 330, 43 S.Ct. 135.

Justice Brandeis's dissent in *Portsmouth*, which asserts the same argument as the County does here, highlights the majority's implied conclusion that proof of the government's specific intent to effect a taking is not required to establish a taking. Justice Brandeis would have held the government liable only if the plaintiff could "show that the government intended to pay the claimants compensation." *Portsmouth*, 260 U.S. at 337, 43 S.Ct. 135 (Brandeis, J., dissenting). Justice Brandeis argued that the plaintiff in

*Portsmouth* failed to allege facts that would constitute a taking because, as alleged there, the government officers who installed the guns "had no intention of subjecting [the government] to any liability." *Id.* at 332, 43 S.Ct. 135. While Justice Brandeis would have required an additional showing that the government specifically intended to subject itself to liability for its authorized action, the *Portsmouth* majority held the government may be held liable based on a showing of authorized governmental action that caused an appropriation of private property.

In *Ridge Line*, the Federal Circuit unambiguously applied the same disjunctive test used in *Trinity*, under which a property owner could prevail on a takings claim by showing either specific intent or causation. The court applied a two-part inquiry to determine whether the government's invasion constituted a potential taking rather than a tort. For the first part, the court applied substantially similar language to that of the *Trinity* test: "a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" *Ridge Line*, 346 F.3d at 1355 (quoting *Columbia Basin Orchard v. United States*, 132 Ct.Cl. 445, 132 F.Supp. 707, 709 (1955)). The second step analyzed whether the government interference was substantial enough to constitute a taking.

The *Ridge Line* court began the first step of the inquiry by noting that the property owner in that case did not allege that the government intentionally appropriated its property. *Ridge Line*, 346 F.3d at 1356. The court nevertheless instructed the trial court on remand to determine whether the plaintiff proved that the harm to its property "was the direct, natural, or probable result" of the government's action. *Id.* Thus, the property owner in *Ridge Line* could establish a takings claim under the causation prong, like that used by the *Trinity* court, in the absence of any proof or allegation of the government's specific or subjective intent to

appropriate private property. *See id.*; accord *Hansen*, 65 Fed.Cl. at 105.

Similarly, in *Fowler I*, a division of this court suggested that evidence of the government's specific intent, in the form of express or implied consent to its contractor's use of private property, was irrelevant where the use of private property was unavoidable given the nature of the authorized action. *Fowler I*, 992 P.2d at 1194. The division in *Fowler I* found record support for the trial court's determination that the defendant was more than merely negligent in allowing its contractors to use private property. *Id.* The division affirmed the trial court's conclusion that a taking had occurred because the use of private property "was a direct, natural, and probable result of" the defendant's authorized actions. *Id.*

 In summary, based on the disjunctive nature of the *Trinity* test language, the case law supporting the supreme court's use of that language in *Trinity*, and the context provided by *Portsmouth, Ridge Line,* and *Fowler I*, we conclude that the *Trinity* test provides two alternative grounds under which a property owner may establish a takings claim. Under the first prong, the specific intent prong, a property owner may establish a takings claim by proving that a governmental entity had "the intent to take the property." Under the second prong, the causation prong, a property owner may establish a takings claim by proving that a governmental invasion had the "natural consequence of taking the property."

**B. Application of Governing Law to the Facts of the Case**

 Scott further contends the trial court erred, as a matter of law, by concluding that the removal of the trees from his property was not a direct and natural consequence of the County's authorized action and therefore was not a taking under the *Trinity* test. We agree.

Initially, we disagree with the trial court's characterization of Scott's case as one based in negligence. Scott never pleaded or argued a negligence claim in this case. Indeed, Scott explicitly argued, in opposition to the

County's motion to dismiss, that his case was not based in negligence and that the reasonableness of the County's preparation for the road improvement project was irrelevant. He further argued that his case was premised on the language of the second prong of the *Trinity* test. Contrary to the trial court's conclusion, from the start, Scott pursued his claim for compensation on the ground of inverse condemnation rather than negligence.

Because, in our view, the controlling facts are undisputed, the legal effect of those facts is a question of law that we review de novo. *Ocmulgee Props. Inc. v. Jeffery*, 53 P.3d 665, 667 (Colo.App.2001).

Here, the following relevant facts are undisputed. The County removed trees while working on an authorized road improvement project. The County intentionally removed the trees in furtherance of the project. It did not accidentally or negligently destroy the trees while attempting to fix the road. Indeed, the County employees testified that they purposefully set out to remove the trees. Further, counsel for the County insisted in the trial court and on appeal that the County only removed trees necessary for the safety and completion of the road work project. Scott does not dispute this. Finally, the parties agree that fifty-eight of the removed trees were on Scott's property.

We conclude these undisputed facts constitute a taking under the second prong of the *Trinity* test. First, not only was it reasonably foreseeable that the trees would be removed as a result of the authorized road work, but also the tree removal was physically unavoidable given the nature of the work required. Because the removal of the trees was unavoidable and done intentionally, it was a direct, natural, and probable result of the actions that the County specifically authorized. *See Fowler I*, 992 P.2d at 1194. Also, contrary to the County's contention, the absence of proof that the County specifically intended the legal consequence of its actions to be a taking is not fatal to Scott's claim for compensation for inverse condemnation. *See, e.g., Portsmouth*, 260 U.S. at 330, 43 S.Ct. 135; *Ridge Line*, 346 F.3d at 1356.

This result appropriately distributes the planned costs of the road improvement project to the beneficiaries of the project, the taxpayers, rather than the injured property owner. *See McMahan's v. City of Santa Monica*, 146 Cal.App.3d 683, 697–98, 194 Cal. Rptr. 582, 590–91 (1983) (citing Arvo Van Alstyne, *Inverse Condemnation: Unintended Physical Damage*, 20 Hastings L.J. 431, 491–95 (1969)), *disapproved on other grounds by Bunch v. Coachella Valley Water Dist.*, 15 Cal.4th 432, 63 Cal.Rptr.2d 89, 935 P.2d 796 (1997). The governmental defendant in *McMahan's* took a "calculated risk" when it adopted what it knew to be an inadequate maintenance plan for water mains. *McMahan's*, 146 Cal.App.3d at 697–98, 194 Cal.Rptr. at 590–91. As the court held in that case, it was thus "proper to require" the defendant, rather than individual property owners, to bear the loss from the ensuing damage caused by the faulty mains. *Id.*

*Trinity* cited *McMahan's* to explain that gross negligence can result in a taking while simple negligence will not. *Trinity*, 848 P.2d at 922. In *Trinity*, water from the defendant's water tanks leaked underground and damaged the plaintiff's property. *Id.* at 919. The court rejected the plaintiff's inverse condemnation claim because the plaintiff failed to show that the defendant "was so grossly negligent as to raise its conduct to being deliberate." *Id.* at 922.

Here, the County contends that its actions were similar to those of the defendant in *Trinity*, because it was at most negligent in removing trees that were on private property. However, the *Trinity* court never considered whether the defendant was negligent with respect to the legal consequence of its actions and did not suggest such a consideration would be necessary even if the defendant was grossly negligent as to the maintenance of its water tanks.

In any event, the defendant's conduct in *Trinity* is distinguishable from the County's conduct in this case. In *Trinity*, the relevant governmental conduct under the second prong of the two-prong test was the defendant's maintenance of its water tanks. Here, the relevant conduct was the County's removal of trees as part of a road improvement project. While the defendant's maintenance

in *Trinity* was at most negligent in causing damage to property, the County here purposefully removed trees from the side of the road. Who owned the trees and the foreseeability of the resulting legal consequence of their removal are irrelevant to the proper legal analysis. *See Portsmouth,* 260 U.S. at 330, 43 S.Ct. 135; *Ridge Line,* 346 F.3d at 1356. Here, the County's conduct was even more culpable than that of the defendant in *McMahan's,* who was grossly negligent. Rather, the County's conduct was similar to that of the defendant in *Fowler I,* who authorized a project that could not physically be completed without the use of private land.

We thus conclude that Scott satisfied his burden of proof under *Trinity* by showing that the County's removal of his trees was a direct and natural result of an action authorized by the County. *See Fowler I,* 992 P.2d at 1194. The undisputed facts also satisfy the remaining elements of an inverse condemnation claim. The authorized action, the road improvement project, was for a public purpose; the County did not compensate Scott for the damage to his property; and the damage was caused by the County, which admits it is a governmental entity that has the power of eminent domain. Thus, the record establishes that Scott proved the required elements of an inverse condemnation claim. *Id.* at 1193–94; *Thompson,* 958 P.2d at 527.

Accordingly, we conclude the trial court erred in granting the County's motion to dismiss and that, as a matter of law, Scott has established a claim for inverse condemnation. *See Ocmulgee,* 53 P.3d at 667. Thus, we reverse the trial court's judgment on liability and remand for a jury trial to determine the amount of just compensation to Scott, pursuant to section 38–1–106.

### III. Compensation

Scott also contends the trial court erred in ruling that the proper measure of damages is the diminution in value standard rather than the restoration cost standard. We disagree.

■ Generally, the proper measure of compensation for injury to real property is the diminution of market value. *Fowler II,*

17 P.3d at 805–06 (applying tort principles to evaluate damages in temporary taking case involving physical damage); *Bd. of County Comm'rs v. Slovek,* 723 P.2d 1309, 1315–16 (Colo.1986).

■ However, the trial court has discretion to apply the cost of restoration as the measure of compensation in an appropriate case. *Fowler II,* 17 P.3d at 805; *Slovek,* 723 P.2d at 1316. When determining whether to depart from the diminution of value standard, the court considers the nature of the owner's use and of the injury. *Slovek,* 723 P.2d at 1315 (citing Restatement (Second) of Torts § 929 cmt. b (1979)). There is no set list of factors the trial court must consider, but the court's principal goal is to reimburse "the plaintiff for losses actually suffered." *Id.* at 1316. The court must also "be vigilant not to award damages that exceed the goal of compensation and inflict punishment on the defendant or encourage economically wasteful remedial expenditures by the plaintiff." *Id.*

■ Because no set list of factors exists for the trial court to consider, the court has broad discretion when determining the standard of compensation. *Fowler II,* 17 P.3d at 805; *Slovek,* 723 P.2d at 1316. We thus consider whether the trial court here abused its discretion by not departing from the diminution in value standard.

Scott contends the appropriate measure of damages here is the cost of restoration. In support of this contention, Scott argues that the cost of restoration is not unreasonable when compared to the value of his land and improvements and that he has personal reasons for having his property restored to its original condition. We disagree with Scott's contention.

In its order granting the County's motion in limine on the appropriate compensation standard, the trial court made the following findings:

11. The Court FINDS that it is economically wasteful to spend approximately $362,000 to reclaim .156 acres, which alleged damage reduced the value of the entire 50–acre property by $277, in light of the diminution in value after the trees

were removed, the nature of the alleged harm, and the nature of the property which was allegedly damaged.

12. The Court FINDS that the evidence shows that Plaintiff's house on the property is not visible from the road and that the roadside property allegedly damaged by Defendants is not visible from Plaintiff's house.

13. The Court FINDS that the personal reason advanced by Plaintiff in support of the cost of restoration as the measure of damages is unpersuasive, especially in light of the fact that a substantial portion of the $362,000 cost of restoration will pay for thousands of gallons of water to reclaim the .156 acre parcel, which would be utilized for watering the .156 acres, which results in no difference in the value of Plaintiff's property. The Court further FINDS that Plaintiff's willingness to waste water to get an increase in the value of his property of approximately $277 is inconsistent with his alleged personal reason supporting the cost of restoration damages.

Based on these findings, the court concluded that the proper measure of compensation was diminution in value.

In its order denying Scott's motion for reconsideration of its damages ruling, the court noted that Scott had not submitted any appraisal "showing a change in value of the entire property (land plus improvements) attributable to the taking." Thus, the court reaffirmed its prior ruling, concluding that:

In the absence of any showing of diminution in the total value of land and improvements based on Defendant's actions, the Court is not persuaded that the prior determination is incorrect. The improvements are not visible from the contested area and the area is not visible from the improvements. There is no showing the removal of trees affected the value of the improvements. The removal of trees was in a. 156 acre parcel which is a de minimis portion of the Plaintiff's property. The total value of all of the land is from $80,000 to $92,000. Restoration costs are unreasonable as a measure of damages in this case because they are four time[s] the value of the entire real property and there is no showing the removal of trees affected the value of the improvements. The requested restoration costs are unreasonable.

Because there is ample record support for the trial court's findings and conclusions, we perceive no abuse of discretion in its ruling that the proper standard for measuring compensation in this case is diminution of value.

Initially, we conclude the trial court was well within its discretion to find the cost of restoration to be unreasonable in this case. In that regard, we note that the parties' disagreement over what value of Scott's property is to be compared to the restoration costs is misguided. The trial court found the cost of restoration, $362,000, to be unreasonable in relation to the value of Scott's unimproved land, approximately $87,000. Scott argues that the true value of his property, including improvements, is somewhere between $300,000 and $421,395. Scott then argues that the cost of restoration is reasonable because it is practically equivalent to the true value of his property.

■■■ In the context of a temporary, partial taking, when determining whether the cost of restoration is unreasonable, the court should not compare the overall value of the property to the cost of restoring part of the property. Instead, the court should look to the cost of restoration in relation to the diminution in value.

Both *Fowler II* and *Slovek* relied on the Restatement (Second) of Torts section 929 comment b as a guide to determine when restoration costs are appropriate. *Fowler II,* 17 P.3d at 805 n. 10; *Slovek,* 723 P.2d at 1315. Comment b to section 929 states that if "the cost of replacing the land in its original condition is disproportionate to *the diminution in the value* of the land," the appropriate measure of damages is diminution in value. (Emphasis added.)

The comparison of restoration costs to overall value would often do nothing to discourage economic waste. For example, the parties here argue extensively about whether Scott's home and improvements on his land should be considered when determining whether restoration costs are appropriate.

However, the record shows the damage to Scott's property caused a diminution in market value of $277 on a .156–acre strip of land. Scott proposes to repair that damage at a cost of $362,000. It should make little difference whether Scott owns fifty acres worth $87,000 or five hundred acres worth $870,000. Spending $362,000 to restore property that was damaged by $277 in market value is no less wasteful if the overall value of the property is $870,000 rather than $87,000. Accordingly, in our view, it makes little difference whether the overall value of Scott's property includes the value of improvements.

Nor do we discern any abuse of discretion in the trial court's finding that Scott did not advance any personal reason sufficient to support the cost of restoration as the measure of compensation here. As noted by the trial court, Scott alleged that his personal reason for restoring the property is "due to his environmental concerns, that he is a careful steward of the land, and that he purchased his property for its views and to potentially retire there." However, the trial court found this reason unpersuasive,

> in light of the fact that a substantial portion of the $362,000 cost of restoration will pay for thousands of gallons of water to reclaim the .156 acre parcel, which would be utilized for watering the .156 acres, which results in no difference in the value of Plaintiff's property. The Court further FINDS that Plaintiff's willingness to waste water to get an increase in the value of his property of approximately $277 is inconsistent with his alleged personal reason supporting the cost of restoration damages.

We thus conclude that the trial court did not abuse its discretion in finding the appropriate standard of compensation to be the diminution in market value. *See Fowler II,* 17 P.3d at 805.

Accordingly, pursuant to section 38–1–106, on remand, a jury shall determine the amount of Scott's compensation under the diminution in value standard.

The judgment on Scott's inverse condemnation claim is reversed; the trial court's orders on the proper standard of compensation are affirmed; and the case is remanded for further proceedings consistent with this opinion.

Judge GRAHAM and Judge ROMÁN concur.