**CITY OF COLORADO SPRINGS, Colorado, Petitioner– Appellee,**

v.

**ANDERSEN MAHON ENTERPRISES, LLP, f/k/a Anderson Mahon Enterprises, a Colorado general partnership, Respondent–Appellant.**

**No. 09CA1087.**

Colorado Court of Appeals, Div. V.

April 1, 2010.

Patricia K. Kelly, City Attorney, William B. Bain, Assistant City Attorney, Colorado Springs, Colorado; Welborn, Sullivan, Meck & Tooley, P.C., Edward J. Bliezner, Sarah M. Clark, Denver, Colorado, for Petitioner–Appellee.

Duncan, Ostrander & Dingess, P.C., Robert R. Duncan, James Birch, Paul C. Rufien, Denver, Colorado, for Respondent–Appellant.

Opinion by Judge GRAHAM.

Respondent, Andersen Mahon Enterprises, LLP, appeals the trial court's order dismissing its inverse condemnation counterclaim against petitioner, the City of Colorado Springs. We affirm.

Andersen Mahon owns property located at the intersection of Woodmen Road and Academy Boulevard in Colorado Springs. It leased the property to Tosh, Inc. for an initial term of six years, beginning July 1, 2004.

Between 2002 and 2003, the City held public meetings to discuss the Woodmen Road Corridor Expansion Project to rework the transportation plan for Woodmen Road to accommodate growth in the area. After the passage of a funding initiative in November 2004, the City adopted a plan to widen Woodmen Road to six lanes and to build an overpass at the intersection of Woodmen Road and Academy Boulevard (the project). In November 2004, the City's project engineer sent a letter to Andersen Mahon stating that "the project is currently in the Environmental Document Review stage" and that the property had been identified as a property "potentially" impacted by the project. The letter clarified that it was not a notice of intent to acquire the property.

Thereafter, in early 2005, upon learning of the potential condemnation of the property, Tosh filed a lawsuit against Andersen Mahon, seeking to unwind the lease transaction based on Andersen Mahon's alleged fraudulent concealment of the project. The parties eventually entered into a settlement agreement on June 6, 2007. Andersen Mahon engaged a commercial real estate broker to lease the property, and the broker disclosed to prospective tenants the City's plans to condemn the property. Andersen Mahon was unable to rent the property from June 6, 2007 to March 27, 2008, when it eventually rented the north half of the building.

On February 16, 2007, the City received the necessary environmental approvals to widen Woodmen Road. One month later, the City sent Andersen Mahon a statutory notice of intent to acquire its property. The City made several offers to purchase the property, but Andersen Mahon rejected the offers.

In August 2008, the City filed a condemnation petition. On September 4, 2008, the City deposited the appraised value of the property into the district court registry and took possession of the property. Pursuant to the parties' stipulation, Andersen Mahon withdrew $1,024,000 of the deposit, which represented the portion of the deposit attributable to the land and improvements owned by Andersen Mahon.

After Andersen Mahon withdrew $1,024,000 from the district court registry and the City took possession of the property, Andersen Mahon filed a counterclaim for inverse condemnation, alleging that the City's delay in acquiring the property constituted a de facto taking and resulted in lost rental income and other expenses.

At the valuation trial held in April 2009, the commissioners determined that the value of the property on the day the City took possession in September 2008 was $1,542,294. The City deposited the additional funds required to satisfy its obligation to Andersen Mahon.

The City moved to dismiss Andersen Mahon's counterclaim pursuant to C.R.C.P. 12(b)(5), arguing that no taking had occurred before the City took possession of the property and that Andersen Mahon's lost rental income was not compensable. The trial court granted the City's motion to dismiss, concluding that under *Lipson v. Colorado State Department of Highways*, 41 Colo.App. 568, 588 P.2d 390 (1978), which the court deemed analogous to this case, the City's precondemnation conduct was not, as a matter of law, a legal interference with Andersen

Mahon's physical use, enjoyment, or power of disposition of its property.

This appeal followed.

## I. Standard of Review

C.R.C.P. 12(b)(5) motions to dismiss test the complaint's legal sufficiency to determine whether the plaintiff has asserted a claim for which relief may be granted. *Hemmann Mgmt. Servs. v. Mediacell, Inc.*, 176 P.3d 856, 858 (Colo.App.2007). In evaluating a motion to dismiss, the court must accept all material factual averments as true and must view the complaint's allegations in the light most favorable to the plaintiff. *Id.* Motions to dismiss for failure to state a claim under C.R.C.P. 12(b)(5) are generally viewed with disfavor and should be granted only if it can be shown "beyond doubt that the plaintiff cannot prove facts in support of the claim that would entitle the plaintiff to relief." *Hurtado v. Brady*, 165 P.3d 871, 873 (Colo. App.2007) (quoting *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665 (Colo.1999)).

We review a trial court's ruling on a motion to dismiss de novo. *Id.* (citing *Fluid Tech., Inc. v. CVJ Axles, Inc.*, 964 P.2d 614, 616 (Colo.App.1998)). We apply the same standard of review to a motion to dismiss as the trial court applies. *Id.* (citing *Shapiro & Meinhold v. Zartman*, 823 P.2d 120, 123 (Colo.1992)).

## II. Inverse Condemnation

Andersen Mahon contends that the trial court erred in concluding that, as a matter of law, a de facto taking had not occurred and that it was not entitled to lost rental income for the period between June 6, 2007, the date Andersen Mahon and Tosh signed the settlement agreement in the fraud case, and September 4, 2008, the date the City took possession of the property. We disagree.

The determination of whether a taking has occurred is a question of law that we review de novo. *Bd. of County Comm'rs v. Roberts*, 159 P.3d 800, 805 (Colo.App.2006). When reviewing a court's decision in condemnation proceedings, we defer to the trial court's findings of fact and conduct a de novo review of its legal conclusions. *Id.* Where the facts material to the issues on appeal are undisputed, the question is solely one of law. *Gavrilis v. Gavrilis*, 116 P.3d 1272, 1273 (Colo.App.2005). We review de novo the trial court's application of the governing legal standards. *See Scott v. County of Custer*, 178 P.3d 1240, 1243 (Colo.App.2007).

Both the Fifth Amendment and Colorado Constitution article II, section 15 prohibit the taking of private property for public use without just compensation. *Id.* at 1243–44; *Thompson v. City & County of Denver*, 958 P.2d 525, 527 (Colo.App.1998).

"To establish a claim for inverse condemnation under the Colorado Constitution, a property owner must show that (1) there has been a taking or damaging of a property interest; (2) for a public purpose; (3) without just compensation; (4) by a governmental or public entity that has the power of eminent domain, but which has refused to exercise that power." *Betterview Invs., LLC v. Pub. Serv. Co.*, 198 P.3d 1258, 1262 (Colo.App. 2008) (quoting *Scott*, 178 P.3d at 1244).

Generally, a taking of property occurs when the entity clothed with the power of eminent domain substantially deprives a property owner of the use and enjoyment of that property. *Krupp v. Breckenridge Sanitation Dist.*, 19 P.3d 687, 695 (Colo.2001); *Scott*, 178 P.3d at 1244; *Fowler Irrevocable Trust 1992–1 v. City of Boulder*, 992 P.2d 1188, 1193 (Colo.App.1999), *aff'd in part and rev'd in part on other grounds*, 17 P.3d 797 (Colo.2001). The requirements for a de facto taking are "a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property." *City of Northglenn v. Grynberg*, 846 P.2d 175, 178–79 (Colo.1993) (quoting *Lipson*, 41 Colo.App. at 569, 588 P.2d at 391); *Claassen v. City & County of Denver*, 30 P.3d 710, 712 (Colo.App.2000).

Physical invasion is not required for a plaintiff to state a claim for relief in inverse condemnation proceedings. *Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XXII, L.L.C.*, 176 P.3d 737, 742 (Colo.2007)

*(Cornerstone).* However, a plaintiff must show a legal interference that substantially impairs his use or possession of the property, *see Bd. of County Comm'rs v. Flickinger,* 687 P.2d 975, 983 (Colo.1984), or that interferes with his power of disposition over his property. *Cornerstone,* 176 P.3d at 742 ("A *de facto* taking does *not* require a physical invasion or appropriation of property. Rather, a substantial deprivation of a property owner's use and enjoyment of his property may, in appropriate circumstances, be found to constitute a 'taking' of that property or of a compensable interest in the property." (quoting 2A Julius L. Sackman, *Nichols on Eminent Domain* § 6.01[15][b] (3d ed. 2006))); *Lipson,* 41 Colo.App. at 569, 588 P.2d at 391.

Here, Andersen Mahon argues that a de facto taking occurred after the City had obtained funding and governmental approvals for the project and had sent the notice of intent to acquire the property, because a "cloud of condemnation hung over" the property, depriving Andersen Mahon of its ability to lease the property. We are not persuaded.

The trial court concluded that the facts in *Lipson* are analogous to the facts in this case and dismissed the case as a matter of law. In *Lipson,* the plaintiffs filed a complaint for inverse condemnation alleging that (1) the defendant, Colorado Department of Public Highways, had determined that it would be necessary, desirable and in the best interest of the people if a portion of the plaintiffs' property were taken for public use in the expansion of South Santa Fe Drive and the construction of an overpass on Belleview over South Santa Fe Drive; (2) the defendant had publicized that an overpass would be constructed, which made the sale or development of the property impossible; and (3) the defendant prepared maps showing such construction and commenced procedures required to obtain the necessary permits, approvals, and funding from the United States Government. The plaintiffs contended that as a result, even though they still held the fee ownership, their property had been taken for public use without just compensation. *Lipson,* 41 Colo.App. at 569, 588 P.2d at 391.

The plaintiffs' complaint was dismissed. On appeal, the plaintiffs contended that, although the fee ownership of the land remained in them, the defendant's announced intention to acquire the property amounted to a taking of property for public purposes without compensation as prohibited by the Colorado Constitution, article II, section 15. *Id.*

The division in *Lipson* held that the "mere announcement of impending condemnations, coupled as it may well be with substantial delay and damage, does not, in the absence of other acts which may be translated into an exercise of dominion and control by the condemning authority, constitute a Taking so as to warrant awarding compensation." *Id.* at 570, 588 P.2d at 391–92 (quoting *City of Buffalo v. J. W. Clement Co.,* 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895, 904 (1971)). The division dismissed the complaint, concluding that because the Department of Highways "has made no physical ouster of the owners from the property, and has not interfered in any way with the owners' power of disposition or use of the property," the plaintiffs' complaint failed to state a claim for inverse condemnation. *Id.* at 570, 588 P.2d at 392.

We note that the law announced in *Lipson* comports with the weight of authority in other states and in the federal courts that mere plotting and planning by a governmental body in anticipation of the taking of land for public use, and preliminary steps taken to accomplish this, does not, in itself, constitute a taking. *See, e.g., Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 15–16, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (concluding that the landowner "failed to demonstrate that its interests were impaired in any constitutionally significant way before the Government tendered payment and acquired title in the usual course" and that although it was certainly possible "that the initiation of condemnation proceedings, publicized by the filing of a notice of lis pendens, reduced the price that the land would have fetched, ... impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking"); *Joseph M. Jackovich Revocable Trust v. State,*

54 P.3d 294, 302 (Alaska 2002) (stating there is no "indication the state did anything more than make announcements, prepare and publish plans, and provide publicity concerning the project" and no evidence the state interfered with the property rights of the landowners); *DUWA, Inc. v. City of Tempe*, 203 Ariz. 181, 52 P.3d 213, 216 (Ariz.Ct.App.2002) (asserting that a taking only occurs when the government has assumed possession of the property or "places a legal restraint upon the property that substantially diminishes or destroys the owner's right to, and use and enjoyment of, the property" and holding that no taking occurred even when the landowner lost its property in foreclosure proceedings); *City of Chicago v. Loitz*, 11 Ill.App.3d 42, 295 N.E.2d 478, 481 (1973) ("service of notices or initiation of negotiations between governmental agency and landowner do not in themselves constitute physical taking or infliction of damage upon property"; these preliminary matters do not in any physical sense invade property or infringe upon possessory rights of owner; in fact, practical considerations may compel abandonment of proposed taking without damage to property in question), *aff'd*, 61 Ill.2d 92, 329 N.E.2d 208 (1975); *J. W. Clement Co.*, 321 N.Y.S.2d 345, 269 N.E.2d at 903 ("We simply have a manifestation of an intent to condemn and such, even considering the protracted delay attending final appropriation, cannot cast the municipality in liability upon the theory of a 'taking' for there was no appropriation of the property in its accepted legal sense."); *Calhoun v. City of Durant*, 970 P.2d 608, 613 (Okla.Civ.App.1997) ("Proposed, but unfulfilled plans to condemn land do not constitute a taking because such plans do not amount to an exercise of dominion and control over the property by the condemning authority and do not prohibit the landowner from exercising dominion and control over his property."); *Kiriakides v. Sch. Dist. of Greenville County*, 382 S.C. 8, 675 S.E.2d 439, 443–44 (2009) (holding that the institution of condemnation proceedings does not constitute a taking, even where the condemning authority abandons the action nine months later); *see also* J.R. Kemper, *Plotting or Planning in Anticipation of Improvement as Taking or Damaging of Property Affected*, 37 A.L.R.3d 127, § 4 (1971) (reporting cases applying the "mere plotting or planning" rule).

The reasons most frequently assigned by the courts for the general rule that mere plotting or planning in anticipation of a public improvement does not constitute a taking or damaging of the property affected are

> that mere plotting and planning does not, in itself, amount to an invasion of property or deprive the owner of his use and enjoyment thereof; that the projected improvement may be abandoned by the condemnor and the property never actually disturbed; that the threat of condemnation is one of the conditions upon which an owner holds property; and that the general rule is in aid of the growth and expansion of municipalities.

Kemper, 37 A.L.R.3d 127, § 4.

Andersen Mahon urges that the trial court's reliance on *Lipson* was misplaced for several reasons. We address and reject each contention in turn.

■ First, Andersen Mahon argues that unlike *Lipson*, the City's precondemnation activities "go far beyond merely announcing a road project and 'commencing' the processes to obtain the funding and environmental approval"; here, the City had obtained the funding and environmental approvals and had sent the notice of intent to acquire the property. We view this as a distinction without a difference. Sending a notice of intent to acquire the property and having funding and environmental approvals in place were merely steps in the planning process to widen the road. As *Lipson* indicates, a de facto taking requires the condemning authority to do more than plan and prepare for a project; it must also commit some affirmative act that legally interferes with the property and results in the condemning authority's exercise of dominion and control over the property. The mere existence of funding and environmental approvals for the project and the issuance of a notice of intent to acquire the property do not automatically result in a de facto taking. At that point, the project still could have been abandoned by the condemnor and the property never actually disturbed.

To the extent Andersen Mahon argues that the duty to disclose the City's plan to condemn the property to potential tenants qualifies as "legal interference" contemplated by *Lipson,* we disagree. The City did not single out Andersen Mahon and unilaterally impose on it a new legal duty not to commit fraud. Andersen Mahon had a continuing duty to disclose material information about the leasehold. *Cf. Poly Trucking, Inc. v. Concentra Health Servs., Inc.,* 93 P.3d 561, 564 (Colo. App.2004) (a defendant has a duty to disclose to a plaintiff with whom it deals material facts that in equity or good conscience should be disclosed). Andersen Mahon has not cited, nor have we been able to find, any reported decision that concludes a party's duty to disclose material information is tantamount to legal interference with the physical use, possession, or enjoyment of the property or a legal interference with the owner's power of disposition of the property.

Second, Andersen Mahon asserts that here, unlike *Lipson,* the real estate broker acting on behalf of Andersen Mahon was under a legal duty pursuant to sections 12–61–804(3)(a) and 12–61–807(2)(b)(VI), C.R.S. 2009, to disclose to any prospective tenant that the City was going to take the property for the project. Andersen Mahon argues that because sections 12–61–804(3)(a) and 12–61–807(2)(b)(VI) were enacted after *Lipson* was decided, the real estate broker in *Lipson* would not have been required to disclose such information. However, whether a real estate broker would have to disclose this information is irrelevant because, as mentioned above, Andersen Mahon had a duty to disclose this information and that duty existed prior to and after *Lipson.* Furthermore, a real estate broker even at the time of *Lipson* would have been obligated to disclose the City's plan to acquire the property if the broker had actual knowledge of it. *See Morrison v. Goodspeed,* 100 Colo. 470, 477–78, 68 P.2d 458, 462 (1937) (setting forth the elements of fraud).

Third, Andersen Mahon contends that after *Lipson* was decided, the General Assembly amended the language of section 38–1–121(1), C.R.S.2009, to require a condemning authority to give notice of its intent to ac-

quire a property "[a]s soon as" it determines that "it intends to acquire an interest in property" and, therefore, the City was required "to proceed without delay" in acquiring Andersen Mahon's property. Andersen Mahon asserts that this amendment supports the conclusion that the legislature intended the eminent domain process, which begins with the formal notice to the landowner under section 38–1–121(1), "to proceed without delay."

█ We reject Andersen Mahon's contention that an eminent domain proceeding commences with the notice of intent to acquire the property. A condemnation action, like any other judicial proceeding, commences with the filing of a petition and service of a summons. §§ 38–1–102, 38–1–103, C.R.S. 2009. Furthermore, section 38–1–121(1) simply requires that the condemning authority give notice of its intent to acquire an interest in property "[a]s soon as" it determines that it intends to acquire the property and that the notice shall apprise a property owner of the right to have its property appraised and to have the appraisal paid for by the condemning authority. Contrary to Andersen Mahon's assertion, nothing in the statutory scheme imposes a duty on a condemning authority "to proceed without delay" in filing a condemnation petition to acquire the property.

█ Under the circumstances of this case, the trial court correctly concluded that *Lipson* was controlling and that the City's precondemnation conduct, which included securing necessary funding and environmental approvals for the project and sending a notice of intent to acquire the property, did not establish that it had assumed dominion or control over Andersen Mahon's property or had legally interfered with Andersen Mahon's use of its property. Here, there was simply a manifestation of an intent to condemn, and such intent—even considering the protracted delay attending final appropriation—cannot constitute a taking because there was no appropriation of the property in its accepted legal sense (for example, taking possession or exercising some form of control over the use or enjoyment of the property). *See J. W. Clement Co.,* 321 N.Y.S.2d 345, 269

N.E.2d at 903–04. As the Supreme Court has held: "A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." *Danforth v. United States*, 308 U.S. 271, 285, 60 S.Ct. 231, 84 L.Ed. 240 (1939). In sum, there was no appropriation which would permit an award of damages prior to the de jure taking.

Moreover, strong public policy considerations prohibit a finding of a de facto taking in the instant case. To hold that a de facto taking occurs when funding and governmental approvals are obtained or when the notice of intent to acquire the property is sent would be to impose an oppressive and unwarranted burden upon the condemning authority. At the very least, it would serve to penalize the condemnor for providing appropriate advance notice to a property owner. "And to so impede the actions of the municipality in preparing and publicizing plans for the good of the community, would be to encourage a converse policy of secrecy 'which would but raise (greater) havoc with an owner's rights.'" *J. W. Clement Co.*, 321 N.Y.S.2d 345, 269 N.E.2d at 904; *see also Nat'l By–Prods., Inc. v. City of Little Rock*, 323 Ark. 619, 916 S.W.2d 745, 749 (1996) ("Construction of public-works projects would be severely impeded if the government could incur inverse condemnation liability merely by announcing plans to condemn property in the future."); *Santini v. Conn. Hazardous Waste Mgmt. Serv.*, 251 Conn. 121, 739 A.2d 680, 691 (1999) ("[I]f the government were to be considered as having accomplished a compensable taking as a result of mere planning that, because of its publicity, harmed the value of property, public planning would be discouraged, and governmental secrecy in the planning process would be encouraged.").

In so concluding, we reject Andersen Mahon's reliance on cases from other jurisdictions to support its argument that a de facto taking of its property occurred.

In *Joseph M. Jackovich Revocable Trust*, the court specifically held that no taking occurred because there was "no indication the state did anything more than make announcements, prepare and publish plans, and provide publicity concerning the project" and no evidence that the state interfered with the property rights of the landowners. *Joseph M. Jackovich Revocable Trust*, 54 P.3d at 302. Thus, this case does not undermine the holding in *Lipson*.

*Klopping v. City of Whittier*, 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972), is distinguishable from the matter at hand. *Klopping* was not a de facto taking case, like the one asserted here. Rather, *Klopping* presented issues of valuation at the actual eminent domain proceedings filed by the city—namely, whether the court should consider the adverse economic effects of precondemnation publicity on the taken property. *Id.*, 104 Cal.Rptr. 1, 500 P.2d at 1351. In fact, the *Klopping* court recognized that the prevailing rule to establish a de facto taking required physical invasion or direct legal restraint of the property. *Id.* Subsequent California cases confirm that for a taking of private property to entitle the plaintiff to maintain an action for inverse condemnation, there must be an invasion of the property or appropriation of some valuable property right from the landowner, and the invasion or appropriation must directly and specifically cause the landowner injury. *See Selby Realty Co. v. City of San Buenaventura*, 10 Cal.3d 110, 109 Cal.Rptr. 799, 514 P.2d 111, 117 (1973); *see also Toso v. City of Santa Barbara*, 101 Cal.App.3d 934, 162 Cal.Rptr. 210, 222–23 (1980) (determining that widespread impact resulting from general planning is not compensable; instead, prerequisite for damages for inverse condemnation is formal resolution of condemnation or some other official act toward acquisition of plaintiff's property).

In *Hulsey v. Department of Transportation*, 230 Ga.App. 763, 498 S.E.2d 122, 126 (1998), the court ruled that where the property was taken for roads, and "continuous governmental activity" in road construction caused siltation of the owner's lake, the date of the taking was when the damaging activity had reached a level which substantially interfered with the owner's use and enjoyment of

his property. However, *Hulsey* is inapposite because, unlike here, it involved a direct physical invasion of the subject property.

Unlike the instant case, *Clay County Realty Co. v. City of Gladstone,* 254 S.W.3d 859 (Mo.2008), involved a condemnation blight action where the plaintiffs' retail shopping center had been declared blighted and made the subject of a redevelopment plan. The plan was later abandoned when the city's agreement with a developer fell through, and subsequently the property was again declared blighted.

*Buzz Stew, LLC v. City of North Las Vegas,* 181 P.3d 670, 672 (Nev.2008), is also inapposite because it is a damages case, not a takings case. In fact, the court expressly stated that no taking had occurred because the property owner had failed to show "the invasion of a property right which directly and specially affects him to his injury." *Id.* at 674 n. 16 (quoting *Jones v. People ex rel. Dep't of Transp.,* 22 Cal.3d 144, 148 Cal.Rptr. 640, 583 P.2d 165, 169–70 (1978)).

Finally, we do not find the Pennsylvania Supreme Court's decision in *Conroy–Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A.2d 598 (1974), dispositive of the case now before us. In *Conroy–Prugh,* the publicity from an inevitable condemnation of the condemnee's industrial buildings caused the condemnee to lose tenants and substantial rental income. The court held that the publicity about the inevitable condemnation caused a loss of tenants, making the property useless for its highest and best use—commercial property. Our reading of *Conroy–Prugh* reveals a holding tied closely to a factual situation where publicity incident to a proposed condemnation rendered the property worthless and arguably constituted legal interference with the use and enjoyment or power to dispose of the property. To the extent that decision stands for the proposition that the publicity constituted a taking, we decline to follow it.

In sum, we conclude that the trial court did not err in ruling that, under *Lipson,* Andersen Mahon had failed to state a claim for inverse condemnation as a matter of law.

Accordingly, we need not address Andersen Mahon's request for attorney fees on appeal.

The order is affirmed.

Judge RUSSEL and Judge LICHTENSTEIN concur.